### WALTER et al. v. DUFFY, Collector of Internal Revenue.

(Circuit Court of Appeals, Third Circuit. February 15, 1923.)

No. 2939.

1. **Internal revenue ⬤⇒7—Intrinsic value not resorted to, when fair market value is evidenced by sales.**

   Under Income Tax Act Sept. 8, 1916, § 2 (Comp. St. § 6336b [c]), providing that the fair market price or value of property as of March 1, 1913, shall be the basis for determining the gain derived from the sale or other disposition of property, as well as under the general rules of law, the intrinsic value of the property is not to be resorted to, when the fair market price thereof is evidenced by sales.

2. **Internal revenue ⬤⇒7—Gain derived is determined by fair market value, or fair value.**

   Under Income Tax Act Sept. 8, 1916, § 2 (Comp. St. § 6336b [c]), the gain derived from the sale or other disposition of property is to be ascertained from the fair market value, if there is a market value established which under the circumstances can be designated as fair; but if there is no fair market value, it is to be reckoned from the intrinsic value of the stock in March, 1913, even though there is evidence as to some sales.

3. **Internal revenue ⬤⇒7—"Fair market price" implies "market" with both buyers and sellers.**

   The fair market price of property on March 1, 1913, implies that there must be a market in which there are both buyers and sellers, since a market implies the existence of supply and demand, and without the existence of either factor no market value is shown.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Market].

---
⬤⇒For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes

**4. Internal revenue** ⊂⇒28—**Evidence held not to show there was fair market value for insurance company's stock.**

Evidence that most of the stock of an insurance company, on March 1, 1913, was held by a few families, that it was generally known that proceedings for mutualization of the company under the state law were pending and that the stock would be purchased by the company at the value fixed therein, that there were only a few sales of the stock made within a year of that date, most of which were forced sales, and which were made only after diligent efforts by brokers to discover a purchaser, *held* to show there was no fair market price of the stock as of that date, from which the gain derived by subsequent sale to the company could be ascertained, so that there was no such gain derived, where it was shown that the intrinsic value of the stock had not changed between March 1, 1913, and the date of the sale to the company.

In Error to the District Court of the United States for the District of New Jersey; Charles F. Lynch, Judge.

Action at law by Effe B. Walter, as executrix, and Paul Fitzgerald, as executor, of the last will and testament of the estate of Emeline C. Blanchard, deceased, against Charles V. Duffy, Collector of Internal Revenue, to recover income tax paid under protest. Judgment for defendant, and plaintiffs bring error. Reversed, and new trial awarded.

Alfred G. Reeves, of New York City, and Arthur H. Bissell, of Montclair, N. J., for plaintiffs in error.

Walter G. Winne, U. S. Atty., of Hacksensack, N. J., and Frederic M. P. Pearse, of Newark, N. J. (Carl A. Mapes and Russell D. Burchard, both of Washington, D. C., of counsel), for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. In 1913 the state of New Jersey, by its statute of March 24 (Laws N. J. 1913, p. 152), provided for the mutualization of its insurance companies, and authorized the valuation of their shares of stock. In pursuance thereof, the Court of Chancery of that state appointed three commissioners to investigate the affairs of the Prudential Insurance Company and determine its value. At that time and long prior thereto, as well as on March 1, 1913, the decisive income tax date here involved, Mrs. Emeline C. Blanchard owned 1,890 shares of such stock, and with other stockholders was by notice made a party to the valuation proceeding. There is no proof as to what her stock originally cost her. The commissioner's investigations covered three years, involved a careful study of the assets of the company and the assistance of experts and accountants to determine the value of the shares of its outstanding stock, and it is quite apparent that an attempt to arrive at a fair value thereof by an individual owner, or a casual buyer thereof, was simply impossible, and that a sale or purchase thereof could at best be a mere surmise, and not a dependable standard of value. The report of this commission was duly made to the Court of Chancery, and fixed the value of the stock at $455 per share, was confirmed by it, and the mutualization of the company by the purchase of the stock at that price authorized. In pursuance of this valuation, Mrs. Blanchard in the early part of 1915 trans-

ferred her shares and received from the company $455 per share for her 1,881.41 shares. No contention is now made that the company had proved, and the court ruled out an offer to affirmatively prove, that during the years 1913, 1914, and 1915, while this valuation was being made, the company had not changed its financial status or made any gains or losses which affected the value of its stock. During those years she had simply held her stock certificates, and beyond the current dividends received from the company, and which she duly accounted for as income, she had received no additional income, profit, or increment from the stock or certificates. Receiving, as she regarded, no income from that source, she made no return of income therefrom. The taxing authorities, however, proceeded to place a valuation of $262.50 as the value of her stock on March 1, 1913, in pursuance of that section of the Act of September 8, 1916, which provides:

"For the purpose of ascertaining the *gain derived* from the sale or other disposition of property, real, personal, or mixed, acquired before March 1, 1913, the *fair market price* or *value* of such property as of March 1, 1913, shall be the basis for determining the amount of such gain derived." Comp. St. § 6336b (c).

As a result thereof, they held that the stock of Mrs. Blanchard from March 1, 1913, to the date of her surrender of stock to the company, had increased in value $192.50 per share, and they accordingly taxed her with having received such an income thereon, and collected from her, over her protest, the corresponding income tax which is here in controversy.

To the ordinary mind, in the absence of loss or gain of assets of the insurance company or in the intrinsic value of its stock, this situation is inexplicable, for it is apparent that, if the ascertained value of $455 in 1915, which Mrs. Blanchard got from the company, is the true value of her stock, her stock was of that same intrinsic value, viz. $455, when the statutory valuation proceedings were begun in 1913, was their value on March 1, 1913, when the income base value was fixed, and remained $455 during 1914 and 1915, when the valuation investigation proceeded. The judgment of the court below, entered upon a verdict of the jury, having fixed the value of the stock on March 1, 1913, at $262.50, and that an income of $192.50 per share additional was received thereon by Mrs. Blanchard, as contended by the government, this writ of error was sued out by the executors.

Without entering into a discussion of the numerous assignments of error, which involve refusals of evidence, the charge of the court as to what constituted fair market value under the act, the fixation of value by the taxing authorities, etc., we may say that the questions involved in the case may be resolved into the inquiry as to what, under the peculiar facts of this case, as disclosed by the proofs and rejected offers, are the elements which determine the "fair market price" as provided by the statute. In that regard the charge of the court was:

"This stock of the Prudential Insurance Company was assessed by the representative of the government for taxing purposes as of the value of $262.50 on March 1, 1913. The Revenue Department fixed the fair market value of the Prudential stock as of March 1, 1913, at the sum of $262.50.

*We have that to start out with.* Suit has been brought by the plaintiffs against the government by executors of the estate of a person who owned some of that stock, in which suit it is alleged that the value of the stock as of March 1, 1913, was $455, or some sum in excess of $262.50. It is the burden of the plaintiff to establish to your satisfaction by a fair preponderance of evidence that the stock was worth more than $262.50 on March 1, 1913. It is stipulated in the case that in January, 1915, almost two years afterwards, some stock was sold for $455 a share. Other evidence regarding the value of the stock indicates the record of sales of stock made both before and after March 1, 1913. You will recall some of the statements of the brokers and the amounts at which they sold stock. It is your duty to decide whether the plaintiff has proved that the stock was worth more than $262.50 on March 1, 1913. In deciding that, you may have to decide, or may incidentally decide, what the stock was worth on that day. Now, shares of stock are worth what they bring, and the best evidence of what they bring is the price they actually did bring when offered for sale and sold upon the Stock Exchange. Where stock was freely dealt in before, on, and after March 1, 1913, the quotations on that date are clearly the best evidence of the value of the shares on that day; but in this case there is no quotation as of March 1, 1913, so it becomes your duty to examine the selling price of stock before and after March 1, 1913, and consider it in finding out what the value was on March 1, 1913."

And this was supplemented by the approval of points on behalf of the government, viz.:

"(5) It would appear from the witnesses produced by the plaintiffs that the stock was sold in the so-called market where local securities were dealt in at prices ranging from $205 in 1912 to $262.50 in September, 1913, and the jury may take this into consideration in determining the fair market value as of March 1, 1913.

"(6) In the absence of prices to the contrary, the price at which the stock was sold in the open market is the best guide by which to determine fair market value.

And in its refusal of the defendant's request:

"In sales of such stock as that of the Prudential Insurance Company of America, all the elements or factors which make up actual or intrinsic values are to be taken into account."

[1] At this point we deem it proper to say that, as an abstract statement of the law, the court was right, for undoubtedly the law, as well as the provisions of the governing statute heretofore quoted, is that evidence of intrinsic value is not resorted to when fair market value is evidenced by sales. But the difficulty here is not with the principle, as stated in the charge, but with its application to the peculiar facts of this case.

[2] Turning to such statute, we note the taxpayer's gain—"the gain derived"—was what Congress meant to tax, and it manifestly follows that, where no gain was derived by the taxpayer, no tax was to be imposed. The statute also recognized that "the gain derived" could be ascertained in two ways, viz.: (a) "The sale"; or (b) "other disposition of property." It also recognized that, in ascertaining what was "the gain derived from the sale or other disposition of the property," the basis for determining the amount of such gain derived was also twofold, viz. the primary, well-recognized, and commercially determined evidence of value, viz. "the fair market price," where it existed; but, when that could not be done, as would manifestly be the case

where no fair market price existed, then resort must be had to the second method, viz. ascertaining "the fair * * * value of such property." Considering "gain derived" to Mrs. Blanchard from the standpoint of value, it is clear, under the proofs made or tendered, there was no difference in intrinsic value between her stock in March 1913, and in January-February, 1915. The assets of the insurance company underwent no change between those dates, and therefore from the standpoint of value, real and intrinsic, her stock value was essentially identical at both periods; consequently she derived no gain from it in that particular period. It is clear, therefore, that if taxable gain was derived and rightly assessed by the taxing officers, it must come, not from any act of hers or of the company, but from the fact that other holders of stock by sales of their stock impressed a statutory value on her stock from which her subsequent "gain derived" was to be reckoned and a tax imposed. Such being the case, we turn to the question whether the evidence in the case showed the stock sales had established the "fair market price" the statute made such basis.

[3] Now, what is the market price? What is the fair market price of the statute? We say "fair," since every word used by Congress must be given due effect in the construction of this widely applicable statute, for obviously, while a stock might be bought and sold—and so marketed—and might thus be said to evidence some market price, yet it is obvious that Congress by the addition of the words "fair market price," certainly meant that not only must the market price be ascertained by sales, but that sales so made, the circumstances under which they were made, the subject-matter of the sales, all the attendant circumstances, were to be considered to determine whether such sales served to evidence not alone a market sale, but the fair price which Congress said should be the statutory start or base from which subsequent "gain derived" should be determined.

[4] We start, then, with the fact that we are here dealing with the existence of a market, and a market price evidenced by sales in such market; so that our first and basic inquiry is whether there actually was a market for the sale of this insurance stock. Now, market implies the existence of supply and demand, for without the existence of either factor no market value is shown.[1] Standing alone, offers to sell, with no takers, or offers to buy, with no sellers, show no such concurring willing action of buyer and seller as is involved where a market is made by buyers and sellers who by their respective sales and purchases make a market price which the law takes as evidence of value. Now, in the case before us, we have a situation where we think the existence of a fair determinative, evidential market for this particular stock did not exist. That the stock of the company was not traded in generally is clear. The mutualization in progress, the limited holdings of the stock, its acquisition from time to time by those who bought with a view to holding and awaiting the action of the mutualization, commer-

---

[1] Mill's Political Economy: "The value at any particular time is the result of supply and demand, and is always that which is necessary to create a market for the existing supply."

cially were all factors of unusual character, and made the valuation different from a market created by buyers willing to buy and sellers willing to sell, and where offers to sell challenged the attention of buyers, and offers to buy challenged the attention of sellers. When it was desired to sell or buy this stock, however, a buyer or seller had to be developed. One witness, who dealt for years in stocks at Newark, N. J., where all the sales in evidence seem to have been made, testified that transactions with the Prudential were more or less limited at all times. He testified he made one, two, or three sales a year, and some years none; that it was very little traded in, and, when made, a seller had to develop a buyer or a buyer a seller. To use his own language:

"It always required time and effort, I think without exception, in making a transaction in Prudential stock. It must be remembered that in making a sale a buyer had to be developed at the same time, which was, of course, not easy. There never was a market figured out and offered on Prudential. If it was, it was very nominal. The figures were so nominal, either bid or offered, that it would be difficult to make a transaction without a great deal of delay and consideration."

And when asked what the conditions were which brought this about, counsel for the government objected, and their objection was sustained. In answer to the question as to what he meant by developing a buyer, the witness said:

"The answer is that stocks such as this stock we are speaking of cannot be marketed with any success at all, except as in this case. A purchaser bought that with the knowledge of the company. They bought with no idea of income. It was a matter of hanging on until the mutualization or the real value did appear. It was generally known by every one at that time that that was the case. *I do not think I ever sold that stock to any one, unless there was a man who had the money set to wait for ultimate mutualization.*"

Instancing how sales of this stock were made, the witness testified as to 20 shares he sold:

"I had that stock for sale, and Rowbottom wished to sell it. I made an effort to sell that. I think it took me two or three months to finally make a market for it, and finally get some one to buy it. He was a young man, who lived away up in the back country up here. I think his antecedents were old Prudential, original Prudential stockholders, and I finally sold it. I had to make a buyer, develop a buyer."

Bearing in mind that there are 40,000 shares of this stock outstanding, and that the entire sale, covering the several years here involved, was but 600 or 700 shares, we must also note that some 488 shares were forced sales, and that no sales of any character took place nearer than six months to March, 1913. The proofs show that W. W. Blanchard owned 488 shares of the stock that was testified to as being sold, and that it was pledged to banks as collateral; that during the years from 1910 to 1913 he was forced by the banks to sell it all, to liquidate his loans. His testimony was:

"I had loans in various banks, in this city and other cities. I could not pay the interest, and I was notified by the banks that they would sell the collateral unless I would pay the interest, and I was forced to let the stock go. The banks sold it to pay the loans."

The sales of these collateral stocks ranged from $205 to $260 per share. The fact that a block of 20 shares of it, pledged for $4,400, was sold for $224, or $4,480, indicated the bank was only interested in this forced sale in getting a price which would protect its loan.

Offers were made, and rejected, to prove the circumstances attendant on the sales made; the testimony of an experienced broker, who was one of four to whom all sales of these stocks were restricted, showing that the sales were forced ones; by other witnesses, what the intrinsic value of the stock was; that there had been no change in the asset value of the stock in the years, 1912, 1913, 1914, and 1915, and that in 1902 a trust company in New Jersey had paid $300 a share for substantially nearly 20,000 shares, which it held and got $455 for at the close of the mutualization, were all excluded. Without entering into further details, we may say, the contention of the taxpayer is summarized by the statement made by counsel before the charge, as follows:

"I do not think, your honor, that the government of the United States, or its Internal Revenue Department, has ever sought by any mere technical position to fasten a tax like this. Here was a stock which, owned by only a few people, manifestly the families here in Newark who had practically always owned it, was owned with the clear understanding during those years that the Prudential was going to mutualize, owned with the understanding, public and clear and available to everybody, that the stock would probably be bought by the company at a fair intrinsic valuation. It is not the intention of the United States or its Internal Revenue Department, and I do not think its courts, to say that we will ignore all that stock that was gradually gaining, by a healthy growth through many years, we will ignore all that, because there were a few sporadic sales—and those we have dealt with have been shown eventually to have been forced—we will say that the fair market value of this stock has been fixed, or that we have failed to show that it was not fixed by those few sales. I will grant you, your honor, that if Mrs. Blanchard had bought this stock March 1, 1913, for $262.50; and sold it in January, 1915, for $455, she should pay a tax on the difference; but, had she bought it March 1, 1913, she would have bought it from somebody who was being forced to sell, practically. She would not have paid its fair value. These people were holding their stock."

We are of opinion the court fell into error in holding, as it did, that because sales of this stock had been made, the fact of sales, in itself and without any regard to the circumstances under which they were made, conclusively established the statutory "fair market price" of this stock. Clearly not. As we have said, and again recite, the circumstances were peculiar. The capital stock consisted of 40,000 shares and the state had authorized proceedings looking toward an acquisition of such stock by the policy holders of the company, on the basis of an ascertainment of its value. That it would be mutualized was well understood and on this account, and the fact that Mrs. Blanchard held some 1,800 of its shares, and a strong trust company had 10 years before bought nearly 20,000 of its shares at $300, it is quite evident there would be, as proved the fact, very little movement of the stock, and that when a sale was made a buyer had to be developed, and that, when a sale of as small a lot as 20 shares was attempted, it took from 2 to 3 months to get a buyer, and that, when obtained, it was a man of a family group who held stock and was awaiting mutuali-

zation. In the absence of any existing demand for the stock, in view of the pending proceedings for mutualization, in the light of the facts that public reports disclosed assets of the company which warranted the price subsequently found by the commission, that there was no change in the assets of the company from 1912 forward, it is quite manifest that, when the banks forced the sale of the stock hypothecated by W. W. Blanchard, the price obtained therefor could not be considered as conclusive proof of the "fair market price" which the statute contemplated. Indeed, the fact that it had to be sold in small lots, that it took a space of two years to make it, that buyers had to be hunted to take it, and that the banks which sold were insistent on forcing it to sale, and were only interested in getting a price to cover their loans, these were all elements which showed that the price obtained was not conclusive proof of the "fair market price" contemplated by the statute, and it was error not to admit proof of the circumstances under which the sales were made, and evidence tending to establish the intrinsic value of the stock on March 1, 1913.

The conclusion we have reached finds support in adjudged cases, text-writers, and treasury rulings. North American Tel. Co. v. Northern Pacific Ry. Co., 254 Fed. 417, 166 C. C. A. 49; Chamberlayne on Evidence, § 2099, h and i; Holmes' Fed. Taxes (Ed. 1923) p. 510; Montgomery's Income Tax Procedure (Edition 1923) pp. 538, 1117.

Taking the proofs as they stand in this record, we are of opinion the judgment below must be reversed, and a new trial awarded.