*The deficiency for the year 1920 is $4,419,08. Order will be entered accordingly.*

---

ROSE C. PICKERING, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

R. A. CROTHERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LORING PICKERING, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5840, 5841, 5908. Promulgated November 29, 1926.

No taxable gain resulted from the exchange for stock of news-paper assets owned by the petitioners.

*Eustace Cullinan, Esq.*, and *Marshall P. Madison, Esq.*, for the petitioners.
*George G. Witter, Esq.*, for the respondent.

The Commissioner asserts deficiencies in income taxes for the year 1920 against the estate of Rose C. Pickering, R. A. Crothers, and Loring Pickering, in the respective amounts of $7,999.95, $26,002.78, $7,999.95, all of which are in controversy. The alleged

deficiencies arise from the Commissioner's determination that a taxable gain was realized upon the transfer of certain tangible newspaper assets by the petitioners to a corporation and the receipt of shares of stock therefor.

FINDINGS OF FACT.

Rose C. Pickering, R. A. Crothers, and Loring Pickering were individual citizens of the United States during the taxable year. Rose C. Pickering died subsequent thereto, and this appeal as to her alleged deficiency was taken by the executors of her estate.

From some time in 1895 until April 8, 1920, the Bulletin, an evening newspaper published in San Francisco, was owned by R. A. Crothers for himself as to an undivided one-half interest, and as trustee for Rose C. Pickering and Loring Pickering, each as to an undivided one-fourth interest. For convenience this newspaper property will be referred to hereinafter as the partnership.

On April 8, 1920, Crothers transferred the Bulletin, effective as of April 1, 1920, to the Bulletin Publishing Co., a corporation, which for convenience will be hereinafter referred to as the corporation, in exchange for 10,000 shares of stock of the total par value of $1,000,-000 representing all the authorized capital of the said corporation. All the liabilities of the Bulletin were assumed by the corporation. Crothers retained 5,000 shares of the stock so received as payment for his interest in the Bulletin, and transferred 2,500 shares to each of the other beneficial owners as payment for their respective interests.

The corporation adopted the books of account of the partnership as its own, except that it changed the investment and surplus account to a corporation stock account showing an issue of 10,000 shares of stock of the total par value of $1,000,000, and made a balancing entry thereon on account of "Franchises" in the amount of $367,186.76.

The tangible property in the nature of plant and equipment, the value of which is in controversy in this proceeding, was carried on the books of the Bulletin at April 8, 1913, at $272,012.62, which represented the cost of such assets as they had been acquired from time to time over a period of twenty years or more. The Commissioner admits that this figure represents the undepreciated cost of such assets. Against the cost of such tangibles, the Bulletin had accrued a depreciation reserve at April 8, 1920, in the amount of $128,386.63, as to the amount of which there is no dispute.

On November 15, 1919, the Bulletin made an appraisal of its plant and equipment for insurance and accounting purposes. The

appraisal company found that the "new replacement value" of such assets was $367,699.97, and that the "net depreciated value" of the same at that date was $280,062.52. The report of the appraisal company was submitted in evidence by the Commissioner. For accounting purposes the Bulletin accepted the value found by the appraisal company, wrote up the cost of its plant and equipment to $282,446.84, representing the result of the appraisal and the purchase of new equipment at a cost of $2,384.22, and, at the same time, increased its depreciation reserve account in a corresponding amount to $138,820.85.

Upon the audit of the income-tax returns of the petitioners for the year 1920, the Commissioner held that the undepreciated cost of the assets in question was $272,012.62 as of March 1, 1913; that there was no change in such cost account at April 8, 1920; that the accrued depreciation on the same at April 8, 1920, as shown by the books of the Bulletin, was $128,386.63; and that the net book value or basic cost of such assets at the date of their transfer to the corporation was $143,625.99. In computing the value of the assets transferred to the corporation, the Commissioner accepted the result found by the appraisal company, disallowed any depreciation therefrom as a liability of the corporation and thereby found that assets having a basic value in the amount of $143,625.99 had a fair market value in the amount of $282,446.46 at the date of their transfer to the corporation, and that such transfer resulted in a gain to the petitioners in the amount of $138,820.85. Upon such alleged gain he computed deficiencies as to the returns of each of the petitioners for the year 1920, and issued the notices of such deficiencies that are the bases of these proceedings.

At March 1, 1913, the Bulletin was in first place in the evening newspaper field in daily circulation and advertising receipts. At April 8, 1920, it was in third or fourth place, and its daily circulation was more than 13,000 less than in 1913. In 1913 the Associated Press franchise owned by the partnership was the only satisfactory agency through which telegraphic news could be secured. In 1920 at least two other press associations had become successful competitors of the Associated Press in the evening newspaper field. The average daily paid circulation of the Bulletin in 1913 was not less than 93,000; in 1920 it was not more than 80,000. The market value per name of the circulation of the Bulletin at March 1, 1913, was not less than $15, and, at April 8, 1920, was not more than $10.

The stock received by the petitioners in exchange for the tangible and intangible assets of the partnership had no greater value than the fair market value or price of such assets at March 1, 1913.

OPINION.

LANSDON: The deficiencies here in question rest solely on the Commissioner's allegation that in the exchange of certain assets for shares of stock at April 8, 1920, the petitioners realized a taxable gain in the amount of $138,820.85. It is necessary, therefore, to determine whether, at the date of the exchange, the stock received had a fair market price or value in excess of the fair market price or value of such assets at March 1, 1913. All the stock was closely held. No sales of shares establishing a fair market value or a market for the stock were proved by either party. In the absence of such sales we can determine the fair market value of the stock only by ascertaining the value of the assets for which it was issued. *Walter* v. *Duffy*, 287 Fed. 41; *Phillips* v. *United States*, 12 Fed. (2d) 598; *Appeal of Wallis Tractor Co.*, 3 B. T. A. 981.

Although the Commissioner bases his determination on alleged profit resulting from appreciation in market value of certain tangible property owned by the petitioners at March 1, 1913, at the date of the transfer, it is obvious that we can not so restrict our consideration of the issue here involved. We must determine whether the exchange of the assets as a whole, tangible and intangible, for the stock resulted in gain, and, since we must base our decision on the fair market price or value of such assets at March 1, 1913, as compared with the fair market value of the stock measured by the value of the same assets at the date of transfer, it follows that we must ascertain the fair market value at each date of all the assets involved.

The facts relating to the tangible property are not in dispute. The parties agree that the cost of the assets in question was $272,012.62; that such cost is of record on the books of the partnership at March 1, 1913; that as the result of an appraisal and certain additional purchases it was carried on the books of the company at a value of $282,446.46 at the date of the transfer; that the accrued depreciation reserve at April 8, 1920, was $138,820.85; and that the depreciated cost at that date was $143,625.99. The Commissioner asserts that the assets in question had a market value in the amount of $282,446.46 at the date of transfer. Although the burden of proof of a less or different value rests on the petitioners, the Commissioner introduced an appraisal as of November 15, 1919, made by the petitioners for accounting and insurance purposes, in support of his determination. The petitioners introduced a witness who had been employed by them in 1913, and also at a date subsequent to the transaction, who testified that he was thoroughly familiar with the assets, that they were worth less in 1920 than at the basic date, and that, in his judgment, no one in the market for newspaper equipment would have

considered their purchase at the book cost as of March 1, 1913. No inventories were introduced. No one made any attempt to fix the market value of the assets at the date of the transfer in dollars and cents. We conclude from the evidence on this point that the tangible assets involved had a value less than the amount of $282,446.46 determined by the Commissioner, but how much less, we are unable to say.

The evidence in support of the petitioners' contention that the value of the intangible assets declined very materially between the basic date and the transfer in question is much more clear and persuasive. A witness, who has bought and sold many large newspapers, both before and since 1913, and who qualified as thoroughly competent to give an opinion on the basis for the market value of such properties, testified that the circulation structure of the Bulletin had a fair market value of at least $15 per name at March 1, 1913, and that such value was not more than $10 a name in 1920. He attributed this decline in value to the reduced circulation of the Bulletin and to its decline from first to third or fourth place in circulation and advertising receipts in the evening newspaper field in San Francisco. He also testified that in his opinion, based on the fact that two competing news service associations have successfully invaded the evening news field since the basic date, the Associated Press franchise owned by the partnership at March 1, 1913, and, at that date worth $100,000, had declined greatly in value prior to the transfer here involved. The only evidence adduced by the Commissioner was a report of an appraisal of the petitioners' assets made by an appraisal company as of November 15, 1919, which indicated that assets which had been in use all the way from 7 to 25 years and had cost $272,012.62, then had a fair market value of $282,446.46.

*Judgment will be entered after 20 days' notice, under Rule 50.*