PREMIER PACKING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10192.   Promulgated June 15, 1928.

*Ralph W. Smith, Esq.*, and *Claude I. Parker, Esq.*, for the petitioner.

*A. H. Fast, Esq.*, for the respondent.

638

640

#### OPINION.

TRUSSELL: The petition in this case is signed by R. D. Steele, Will E. Keller and W. V. Ambrose, who were owners of 300 of the 360 outstanding shares of stock of the Premier Packing Corporation at the time that company ceased doing business on March 1, 1918, and were its last duly elected and qualified directors. They made their appeal for the corporation as such stockholders. The deficiency in question is one of the corporation.

By the petition it is alleged that the corporation was never formally dissolved and no trustees were ever appointed to wind up its affairs for which reason the petition is filed by the majority stockholders at the time it ceased business and " voluntarily forfeited its corporate charter."

To this respondent filed a special plea in bar and answer, raising by the plea the question of the right of stockholders to appeal from a deficiency determined against the corporation. The plea was considered on the hearing and permission asked and granted to amend the petition to show the appeal as filed for petitioner by its last directors as trustees for the stockholders and creditors under section 400 of the California Civil Code.

Section 400 of the Civil Code of California provides that in case of the dissolution of a corporation its directors or managers become trustees for its creditors and stockholders to wind up its affairs.

Sections 1227 and 1228 of the California Code of Civil Procedure provide for a dissolution of a domestic corporation by decree of the Superior Court of the County of its residence, upon application of the corporation and a showing that dissolution has been approved by holders of two-thirds of its capital stock and that all of its debts have been satisfied.

The record in this proceeding shows that there has been no dissolution of the petitioner corporation asked or decreed and that it is still in existence, but its corporate rights, privileges and powers have been since March 1, 1919, suspended under an act of the legislature of the State of California approved May 10, 1915, for failure to pay its state license tax, and that under this act the privilege of dissolution is denied it while under suspension. In view of the fact that petitioner is not a dissolved corporation, section 400 of the California Civil Code does not apply and petitioner's directors and managers are not trustees thereunder.

However, it is shown that the appeal is from a final determination of a deficiency against the corporation and the petition is filed by all members of its board of directors and that these also include the general officers of the corporation who as individuals are holders of two-thirds of the capital stock. Under these conditions, for the purposes of the appeal, we consider the corporation as before the Board and the petition as sufficient for a review by us of the deficiency.

By the proof introduced at the hearing it is shown that the taxpayer, a California corporation, had operated successfully for several years subsequent to its organization in 1914 and that during January, 1918, several promoters of a new company, the International Packing Corporation, organized for the purpose of consolidating the assets and businesses of several tuna-fish-packing companies, purchased all of its stock from its then owners for the sum of $100,000, appreciated its net asset account on its books by the sum of $32,338.91, and caused it to transfer all its assets, including good will, to the new corporation for 1,250 shares of the stock of that company. A certificate for 1,250 shares of stock was issued to the taxpayer by the new corporation on February 9, 1918, and this was immediately transferred and reissued the same day to the stockholders of petitioner in the proportion of their stockholdings to its total stock issued.

The respondent has computed a total profit accruing to petitioner, in this transfer of all of its assets, of $36,860.08, and upon this profit has determined the deficiency in income and profits tax here involved of $18,364.70. This profit is arrived at by computing the net cost of the conveyed assets at $88,139.92 and considering the 1,250 shares of stock received in exchange as worth its par value of $125,000.

Section 202 (b) of the Revenue Act of 1918 provides:

When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; * * *

Petitioner insists that no profit accrued from the sale of assets for stock, as detailed, as the stock in question had no fair market value in excess of the cost of the property conveyed. Respondent contends that such fair market value is shown by the fact that at organization of the new corporation a considerable amount of stock was issued to the organizers for cash at par.

The mere fact of one or more sales of stock at a given figure does not in itself prove that to be its fair market value. The circumstances in connection with such sales must be considered and if they be shown to have been made under peculiar conditions indicating some inducing cause other than the mutual desire of seller and buyer to make on the one hand an advantageous disposal, and on the other a wise purchase, they can not be considered as determining a fair market value for the

stock. In *Walter* v. *Duffy*, 287 Fed. 41, the question presented was the fair market value of a stock at March 1, 1913, various sales having been shown shortly before and after that date. In holding that those particular sales did not prove a market and consequently could not be considered as establishing a fair market value the court said:

Now, what is the market price? What is the fair market price of the statute? We say "fair," since every word used by Congress must be given due effect in the construction of this widely applicable statute, for obviously, while a stock might be bought and sold—and so marketed—and might thus be said to evidence some market price, yet it is obvious that Congress by the addition of the words "fair market price" certainly meant that not only must the market price be ascertained by sales, but that sales so made, the circumstances under which they were made, the subject-matter of the sales, all the attendant circumstances, were to be considered to determine whether such sales served to evidence not alone a market sale, but the fair price which Congress said should be the statutory start or base from which subsequent "gain derived" should be determined.

We start then, with the fact that we are here dealing with the existence of a market, and a market price evidenced by sales in such market; so that our first and basic inquiry is whether there actually was a market for the sale of this insurance stock. Now, market implies the existence of supply and demand, for without the existence of either factor no market value is shown. Standing alone, offers to sell, with no takers, or offers to buy, with no sellers, show no such concurring willing action of buyer and seller as is involved where a market is made by buyers and sellers who by their respective sales and purchases make a market price which the law takes as evidence of value. Now, in the case before us, we have a situation where we think the existence of a fair determinative, evidential market for this particular stock did not exist. That the stock of the company was not traded in generally is clear. The mutualization in progress, the limited holdings of the stock, its acquisition from time to time by those who bought with a view to holding and awaiting the action of the mutualization, commercially were all factors of unusual character, and made the valuation different from a market created by buyers willing to buy and sellers willing to sell, and where offers to sell challenge the attention of buyers, and offers to buy challenge the attention of sellers.

In the case of *Phillips* v. *United States*, 12 Fed. (2d) 598, the court in following the rule laid down in *Walter* v. *Duffy, supra*, held that various sales of stock made on a stock exchange under peculiar conditions were not proof of fair market value. In this case the court said:

The stock sales made from time to time are to be considered together with the nature and extent of the sales and the circumstances under which they are made; hence forced sales or sales of small lots, may often be no real indication of the value.

The proof in the case before us shows that the new corporation purchased the assets of four companies and that in the case of three of these the cost of the assets was considerably appreciated prior to transfer. For these assets the new corporation issued its stock except that in one case, that of the Pacific Tuna Canning Co., $51,000

in cash was paid in addition to the stock issued. The new company disposed of 2,120 shares of stock at par, 1,875 of these being to its promoters, and the balance of 305 shares to outsiders. It is these sales of stock which respondent contends prove the fair market value of the stock to have been its par value.

On examining the circumstances of these sales of stock we do not find those conditions to exist which under the decision in *Walter* v. *Duffy*, *supra*, are held essential to a determination of fair market value. It is shown that this stock was not listed on an exchange nor sold in response to a demand. Approximately 85 per cent of it was sold to the promoters and these sales appear to have been induced by other considerations than the value of the stock. Many of these parties were by the purchase of the stock securing in addition something of very considerable value. The largest block of stock, 944 shares, was sold to a Mr. Haussels, whom it was agreed would be president of the company at a considerable salary. This party testified that he realized that he was paying a premium for the stock but the inducement for him to invest approximately $100,000 at par was that he would get a salary which would in itself be a good dividend on more than the investment.

Others of the promoters were to be salaried officers of the corporation. Ward, who purchased 200 shares, was made assistant secretary.

Ambrose, who purchased 165 shares, was the former president of the Premier Packing Co. and was made general manager of the new company.

Steele, who purchased 90 shares, was made secretary. Van Landingham, who purchased 72 shares, was a fish broker and it was agreed that he should have the general sales agency for the corporation.

The outsiders who purchased stock are shown by the record to have been personal friends or business associates of these promoters who bought small blocks of stock on their inducement without personal knowledge of its value.

There are no resales of the stock shown after organization. It was never listed on an exchange. One instance testified to by Ambrose throws some light on conditions and indicates the absence of a market for the stock. This party stated that following the organization he attempted to dispose of part of his stock, as he was pressed for funds, and the broker to whom he applied finally found a purchaser at $80 a share, which would have netted him $75 after payment of the commission asked. A necessity to pay a brokerage commission of approximately 6 per cent does not indicate a market for the stock but a condition necessitating the development of an individual purchaser. See *Walter* v. *Duffy*, *supra*.

There is evidence that a year and a half after organization, on a refinancing of the corporation, an issue of preferred and common

stock was placed through brokers at par, but it is not thought that this can be considered as determining a fair market value of par for the original stock issued, at the time of organization of the company, as it was at a later date and we are not advised of the character and conditions of the new stock.

We can not find under the proof that a fair market value is shown for the stock of the new company, issued on organization, by the original subscriptions therefor at par, and accordingly must consider the actual or intrinsic value of the stock as determined by the asset values which it represented. See *Wallis Tractor Co.*, 3 B. T. A. 981. Four companies turned in their assets for stock. In the case of three of these the costs of the assets were increased for purposes of the transaction. Certain additional stock was sold for $212,000 cash at par and $51,000 of this amount was paid to one of these companies as a consideration for its assets in addition to the stock issued to it.

It will thus be seen that the new corporation received assets and cash against which its stock was issued as follows:

| From: | | Book assets |
|---|---|---|
| Petitioner | | $92,661.09 |
| Pacific Tuna Canning Co | | 104,861.76 |
| San Pedro Packing Co | | 107,820.14 |
| Pioneer Co | | 30,000.00 |
| | | 335,342.99 |
| Cash: | | |
| Promoters | $181,500 | |
| Outsiders | 30,500 | |
| | | 212,000.00 |
| | | 547,342.99 |
| Less cash paid Pacific Co | | 51,000.00 |
| | | 496,342.99 |
| Par value of stock issued | | 601,000.00 |
| Excess of stock over asset value | | 104,657.01 |
| Book value of stock per share | | 82.58 |

The testimony in the record as to the actual value of the stock of the new corporation at the time of the organization and transfer was that of Wiley V. Ambrose, who was the president of petitioner and became the general manager of the new corporation, and who was active in the organization of that company. This witness testified that he valued the assets taken over by the new corporation and considered the actual value of the stock of that corporation at the time of the transaction to be around $75 per share.

Under these conditions we can not conclude that the stock had an intrinsic value equal to its par value. The indication is that its

intrinsic value is less than par and in the light of all the facts, our conclusion is that the value of the stock issued for assets of the Premier Packing Co. was not in excess of the cost of the assets transferred and that no gain accrued from the sale.

In respect to petitioner's defense that assessment and collection of any deficiency is barred by the statute of limitations it is contended that an unlimited waiver signed by R. D. Steele in October, 1922, as " former secretary " of the company is void, as under the by-laws of the corporation the president alone could execute such a document and then only by direction of the board of directors. It is insisted by respondent in his brief that the benefits secured by the waiver were accepted and enjoyed by the corporation with the knowledge of the directors and that the corporation approved the authority of its secretary to execute the waiver by conferring and negotiating with respondent through its officers, in respect to its tax liability, for several years, with knowledge that the waiver was being relied upon as a binding corporate agreement.

The waiver in question is shown by the record to have been signed by one of the general officers of the corporation as an incident of the adjustment of its income-tax matters. The facts are sufficient in our opinion to raise the presumption of knowledge, and consequently of acquiescence, on the part of the corporation in his exercise of this authority, and this presumption is not rebutted merely by evidence that he lacked authority under the corporate by-laws to so act. See *American Feature Film Co.*, 11 B. T. A. 1271, and *Welz & Zerweck, Inc.*, 11 B. T. A. 1416.

We also note that the deficiency as determined is stated in the deficiency letter as follows:

An audit of your income and profits tax *returns for the month of February, 1918*, has resulted in the deficiency in tax of $18,364.70 *for that period* as shown in the attached statement.

There is no indication in the record that petitioner filed a return for the *month of February, 1918*, and that is not a taxable period. It is shown that it made a regular return in June, 1919, for its fiscal year 1919, which included the month of February, 1918, and that during all of that fiscal year it was in existence. If it appeared that the corporation only did business for this one month and only received income during that period and all of that income was included in a determination made on a 12-month basis, it might be urged that, under the circumstances, the 1-month period referred to actually constituted the whole 12 months and the determination was for the fiscal year 1919.

However, such appears not to be the case as the record shows that petitioner had other income during the fiscal year ending January

31, 1919, on which it paid a tax of $1,278.17. This appears not to have been considered by respondent.

In the case of *Bankers' Trust Co.* v. *Bowers*, 298 Fed. 89, arising under the 1921 Act, but in which all the provisions here involved are the same, the court said:

The fundamental scheme of title II of the Revenue Act is for a tax upon the net income of the taxpayer during an accounting period of 12 successive months. This general accounting period seems to be a predetermined measure to be applied to a taxpayer as income, and is not affected by his death or change of status within the period. The tax is imposed upon the entire net income for such period, and the return of such income constitutes his return for the period of 12 full months, even though he may have lived only a portion thereof. The exception to this is where a voluntary change is made in the accounting period by the taxpayer, or where it becomes involuntary in so far as the taxpayer is concerned by the Commissioner's declaring the taxable period terminated under section 250 (g).

Petitioner, under the facts in this case, could have no deficiency for " the month of February, 1918." The deficiency, if any, is for the fiscal year ending January 31, 1919, and should be redetermined in accordance with the foregoing findings of fact and opinion and in that redetermination credit should be given for any tax paid by or for petitioner under its return filed for that period.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

SIEFKIN, PHILLIPS, and MURDOCK dissent on the ground that no proper petition was filed by or on behalf of the corporation within the statutory period which would give the Board jurisdiction to make a determination of any binding force upon the corporation.