ESTATE OF WILLIAM MCDOUGALL, BY ANNE A. MCDOUGALL AND KENNETH DOUGAL MCDOUGALL, CO-EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 100915. Promulgated November 25, 1941.

*Albert W. Kennon, Jr., Esq.*, for the petitioners.
*Harold F. Noneman, Esq.*, for the respondent.

806

## OPINION.

TURNER: In the estate tax return filed for the decedent the preferred stock of the Fre-Dou Corporation was returned at $50 per share and the common stock was returned at $25 per share. The respondent determined that the preferred stock had a value of $100 per share and the common stock $50 per share. It is alleged in the petition and petitioners now claim that the preferred stock had a value of only $10 per share and the common stock $1 per share and that they are entitled to a refund on account of an overpayment of tax.

The burden is on the petitioners to prove that the value placed on the stock by the respondent was incorrect. *Commissioner* v. *Robertson*, 75 Fed. (2d) 540. In addition to the prima facie correctness of the respondent's determination, he has established that from May 1935 through November 1938 the corporation sold its preferred stock for $100 per share and its common stock for $50 per share and that during that period it received from such sales the total sum of $44,581.

The dates of the sales were rather evenly spaced throughout that period and one of such sales was made to the wife of the president of the corporation. For reasons unknown to us the petitioners did not establish whether the decedent purchased the stock in question, and, if so, the cost thereof, or when or how he acquired it. The president of the corporation indicated in his testimony that there were several stock transfers on the books of the corporation which did not represent stock subscriptions, but the details of these transactions were not brought out.

The respondent places a great deal of reliance on the sales above described, while the petitioners attempt to minimize their importance in so far as they tend to establish fair market value, contending on brief that sales of stock by subscription to capital negotiated by promoters do not establish a "market value." The authorities cited by the petitioners do not support any such proposition. In *Heiner* v. *Crosby*, 24 Fed. (2d) 191 cited by petitioners, the court said that sales alone without regard to the circumstances under which they are made do not conclusively establish value. In the instant case the evidence does not show, as suggested, that such sales were made only after a "diligent effort" to develop a buyer, *Walter* v. *Duffy*, 287 Fed. 41, nor does it appear, as suggested, that such sales were made to organizers or promoters who were to receive salaried positions with the corporation, *Premier Packing Co.*, 12 B. T. A. 637. True, the stock was not listed or traded in on any exchange, but that fact does not establish that the stock had no market value. Here the record does not show whether the decedent or his estate ever made any effort to sell the stock.

The petitioners argue that the business of the corporation is highly speculative and that that fact tends to negative market value. The cases cited do not support that proposition, and, as the respondent suggests, the speculative character of stock might well be the element which gives it value. The facts here are too meager to support either view.

A study of the balance sheet and the statement of receipts and expenditures of the Fre-Dou Corporation gives very little aid in determining the value of its stock. The importance to be attached to the balance sheet would seem to depend largely upon the proper value to be placed upon the Hebrew contract (the contract with Mt. Sinai was not listed at all), but, accepting the various items as listed, the preferred and common stock seems to have a book value at least equal to the value determined by the respondent. In view of the working arrangement between the Fre-Dou Corporation and the Frederick Douglas Memorial Park and the fact that a considerable portion of the funds advanced by the former to the latter was

used for development purposes, it would seem that the financial position of one would have to be considered in conjunction with the other. The cemetery during the period prior to the decedent's death was obviously in the development stage and the absence of quick assets under the circumstances does not show the absence of value for the stock.

We do not think the petitioners have shown that the respondent erred in determining the fair market value of the preferred and common stock of the Fre-Dou Corporation owned by the decedent at the time of his death and his determination is accordingly sustained.

The next question is whether the respondent erred in including in the decedent's gross estate certain intangible personal property situated in England. The decedent was a British subject, but at the time of his death Durham, North Carolina, was his domicile and place of residence. The petitioners concede that the statute by its language requires the inclusion of the property in question in the decedent's gross estate. Secs. 303 and 304, Revenue Act of 1926, as amended by sec. 403, Revenue Act of 1934. They contend, however, that, since the decedent was a British subject, the United States and its laws afforded no protection to him with respect to his property located in England and therefore the imposition of the tax on the transfer of such property at and by reason of his death is as to the United States extrajurisdictional and beyond the power of Congress; and, further, that the inclusion of such property in the gross estate is in violation of rights guaranteed by the Fifth Amendment to the Constitution.

Although the statutory provision in question has stood unchanged since the passage of the Revenue Act of 1934, this seems to be the first time the question here involved has been presented for the consideration of this Board or any of the courts; at least neither party has cited a case directly in point, and we have found none.

According to the pronouncements of the Supreme Court in *Burnet* v. *Brooks*, 288 U. S. 378, the national power as it relates to other nations and their subjects and apart from "any self-imposed constitutional restriction" is to be determined "by applying the principles of jurisdiction recognized in international relations." In that case the Court upheld the right and power of Congress to tax as a part of the gross estate of a nonresident alien certain securities, the physical evidences of which were located in the United States. The Court pointed out that the jurisdiction to impose a tax with respect to the same property might exist in more than one government and might rest on any one of four distinct grounds—the citizenship of the owner, his domicile, the source of income, or the situs of the property. The situation, said the Court, has resulted in efforts "to preclude

multiple taxation through the negotiation of appropriate international conventions."[1] It was noted however that these endeavors have proceeded "upon express or implied recognition, and not in denial, of the sovereign taxing power as exerted by governments in the exercise of jurisdiction upon any one of these grounds."

In the instant case the decedent, though a British subject, was domiciled in the United States, and, domicile being one of the distinct grounds recognized as fixing the jurisdiction of a sovereign power, Congress was clearly within its power in requiring the inclusion of the decedent's intangible personal property in his gross estate, even though the evidences of such property were actually located in England. In *Burnet* v. *Brooks, supra,* and *First National Bank of Boston* v. *Commissioner,* 63 Fed. (2d) 685, the jurisdictional ground for the tax was the situs of the property. In *United States* v. *Bennett,* 232 U. S. 299, and *Guaranty Trust Co.* v. *Commissioner,* 79 Fed. (2d) 245, it was citizenship. In this case the power to impose the tax rests on domicile.

It is the further claim of the petitioners that in the Fifth Amendment there is a constitutional restriction on the power of the United States to impose a tax with respect to the property of an alien where the situs of the property is in a foreign country. It is argued that inclusion of such property in the gross estate of such alien for Federal estate tax purposes amounts to the taking of his property without due process. Answering this contention, the respondent relies on the decision of the Supreme Court in *Curry* v. *McCanless,* 307 U. S. 357, wherein it was held that both Tennessee, the state of the decedent's domicile, and Alabama, where certain securities belonging to the decedent were actually located, had the power to impose death taxes in respect of the said securities and the imposition of such taxes by either state was not in violation of the due process clause of the Fourteenth Amendment. With respect to the applicability of *Curry* v. *McCanless,* the petitioners in their brief state that "The cases cited * * * show the basis of that decision to be one resting on the fact that under our Constitutional system the full faith and credit clause thereof gives any state full protection over intangible rights, regardless of where the property interests are supposed to be situated." Reading that decision, we find no justification for such a contention, even though some of the

---

[1] According to a footnote one of the drafts of convention referred to by the Supreme Court appears in a publication entitled "Double Taxation Relief," Bureau of Foreign and Domestic Commerce, Department of Commerce, Jan. 1928. One of the subjects covered in that publication was the problem of multiple taxation as it relates to succession duties. In stating a proposed solution, the framers of the document said: "In the first place, the principle is recognized that the country in which the deceased was domiciled at the time of his death may levy succession duties on the entire estate." They recognized that, in drawing up any proposal for the elimination of double succession duties, "an agreement had at first to be reached as to which country should yield its right to tax, that of domicile or that of situs."

cases cited may have dealt with the full faith and credit clause of the Constitution. In *Curry* v. *McCanless* the Supreme Court found that the decedent, being domiciled in Tennessee, enjoyed certain rights and privileges under Tennessee law with respect to the intangibles involved, even though the evidences thereof were located in another state, and found therein a sufficient ground to support a right in the State of Tennessee to impose the tax. The Court said: "The decedent's power to dispose of the intangibles was a potential source of wealth which was property in her hands from which she was under the highest obligation, in common with her fellow citizens of Tennessee, to contribute to the support of the government whose protection she enjoyed. Exercise of that power, which was in her complete and exclusive control in Tennessee, was made a taxable event by the statutes of the state. Taxation of it must be taken to be as much within the jurisdiction of the state as taxation of the transfer of a mortgage on land located in another state and there subject to taxation at its full value."

While in the instant case the decedent was not a citizen of the United States, he was domiciled here, and much that was said by the Supreme Court in *Curry* v. *McCanless*, *supra*, with respect to the rights and privileges of the decedent therein under the laws of Tennessee is equally applicable to the rights and privileges enjoyed by the decedent in the instant case under the laws of the United States. It is true that certain of the decisions of the Supreme Court have indicated a difference in the practical application of the due process clause as contained in the Fourteenth Amendment to the states and similar application of the due process clause contained in the Fifth Amendment to the Federal Government. But where such distinctions have been drawn they have tended to show much greater restrictions with respect to the powers of the states as between themselves than with respect to the powers of the Federal Government as they relate to other nations and their subjects. *Burnet* v. *Brooks*, *supra*, pp. 403–5. In *Union Refrigerator Transit Co.* v. *Kentucky*, 199 U. S. 194, the Court said: "Because the limitations of the Constitution are barriers bordering the states and preventing them from transcending the limitation of their authority, and thus destroying the rights of other states, and at the same time saving their rights from destruction by the other states * * *, affords no ground for constructing an imaginary constitutional barrier around the exterior confines of the United States for the purpose of shutting that government off from the exertion of powers which inherently belong to it by virtue of its sovereignty." The application to the states of the rule of due process, said the Court, "has no application to the government of the United States so far as its admitted taxing

power is concerned", which power "embraces all the attributes which appertain to its sovereignty in the fullest sense." We have not been able to find anything in the cases cited to indicate that the due process clause of the Fifth Amendment restricts, or was in any way intended to restrict, the power of the Federal Government in the imposition of the tax with respect to intangible property owned by an alien domiciled in and a resident of the United States, even though the physical evidences of such property are located in a foreign country. The property in question was properly included in the decedent's gross estate. Cf. *Frank W. Ross*, 44 B. T. A. 1.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

MELLOTT dissents on the second point.