Estate of Bertram E. Linde, Deceased, Lucius P. Wasserman, Executor, v. Commissioner.
Estate of Bertram E. Linde v. Commissioner
Docket No. 21190.
United States Tax Court
1949 Tax Ct. Memo LEXIS 6; 8 T.C.M. (CCH) 1102; T.C.M. (RIA) 49296; December 27, 1949
*6 Bernard A. Green, Esq., for the petitioner. Francis X. Gallagher, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding is brought for redetermination of a deficiency in estate tax of $7,793.11. The only question is the value at which decedent's interest in shares of stock of J. E. Linde Paper Company should be included in gross estate. The question depends upon their fair market value determined by respondent to be $60 per share. Other adjustments are not contested. The parties have filed a stipulation of facts. Findings of Fact The stipulated facts are hereby found accordingly. The estate tax return of the Estate of Bertram E. Linde was filed with the collector of internal revenue for the first district of New Jersey. Bertram E. Linde, herein called decedent, was a resident of Middletown, New Jersey. He and his two sisters, Gertrude and Elsie, were joint owners of 3,000 shares of common stock of J. E. Linde Paper Co., hereinafter called the company. The 3,000 shares were purchased by decedent and his sisters from their mother, Kate S. Linde, 1,000 shares being acquired in 1935 and 2,000 in 1936. The contract *7 of sale for the 2,000 shares provided, in part: "2. Purchasers agree to pay to the Seller, as the purchase price for the purchase of the aforesaid two thousand (2,000) shares of the Common stock of J. E. LINDE PAPER COMPANY, as follows: * * * "The sum of Two thousand four hundred ($2400) Dollars per year to JOHN E. LINDE, son of KATE S. LINDE, as long as said JOHN E. LINDE lives * * *." Decedent's will, executed on October 7, 1938, contains the following provision: "SECOND: I give, devise, and bequeath to my sisters, * * * or the survivor of them, any interest which I may have in the J. E. LINDE PAPER COMPANY * * * at the time of my death under [the above purchases and agreements] * * *." Decedent died on March 8, 1945. In addition to his interest in the above 3,000 shares, at the time of his death he owned 354 shares of common stock in the same company. Payments of $2,400 a year, pursuant to the above agreement, are still being made to John E. Linde who was 59 years of age at the date of decedent's death. Decedent was indebted to the company in the amount of $42,749.31, for which he had pledged as collateral 700 shares of common stock in the company. In the estate tax *8 return petitioner neither included the 700 shares nor deducted the indebtedness to the company, treating the two as a "washout." In October, 1945, the company accepted the 700 shares in full satisfaction of the debt. Stock of the company was not openly traded on the market on or about the date of decedent's death. It has always been closely held. On June 26, 1945, decedent's sisters sold 3,632 shares of common stock in the company to Samuel G. Garner, Lucius P. Wasserman, and Michael J. Shagan. Garner was president of the company and has been connected with it for about 42 years. The contract of sale recited - "* * * a total purchase price of $60. per share, payable $10 in cash simultaneously herewith and the balance by delivering to you our debentures in the form hereto annexed * * *." In the debentures, Garner, Wasserman and Shagan promised to pay "the registered owner hereof" $50 per share in June, 1970, with interest at 4 per cent per annum. The debentures contain provisions permitting the owners to cash them before maturity at reduced amounts: 50 per cent of the face value plus an additional 2 1/2 per cent for each year beyond the first two years that the debentures remain *9 outstanding. By purchasing the 3,632 shares from decedent's sisters, Garner, Wasserman, and Shagan acquired the controlling interest in the company. In addition, they purchased 354 shares from petitioner on the same terms and conditions. In May, 1944, the company purchased 351 shares of its common stock from A. E. Kinn, Chairman of the Board of Directors, for $7,000. The company is engaged as a jobber representing paper mills in the sale of fine paper for printing. It serves as distributor for most of the country's leading paper manufacturers. All of its franchise arrangements with them are terminable at will. During its fiscal year ended November 30, 1945, the company's outstanding capital stock consisted of 4,801 shares of $50 par value common and 235 shares of $100 par value preferred. The company realized a net profit, before payment of Federal income taxes, of $39,408.87 for the same year. Its books as of November 30, 1945, disclosed the credit to surplus to be in the amount of $131,530.78. As of the close of the fiscal years ended November 30, 1941, to 1944, inclusive, the number of outstanding shares of common stock, the approximate book value per share, and the corporate *10 earnings applicable to each after meeting the requirement of 8 per cent dividends on preferred stock, were as follows: Book
Total Earn-
Value
ings Ap-
Earnings
Shares of
Per
plicable to
Per
Year
Common
Share
Common
Share
1941
6,832 $52
$33,649
$4.92
1942
5,872
56
26,508
4.51
1943
5,872
60
20,290
3.45
1944
5,521
64
9,946
1.80
The company has never paid any dividends on common stock. In his notice of deficiency respondent determined - "* * * that the decedent's 354 shares of common stock of J. E. Linde Paper Company had a fair market value of $60.00 per share at the date of death. * * *
"It has been determined that an amount of $60,000.00 is includible in the gross estate, the amount representing the fair market value at the date of death of the decedent's one-third interest in 3,000 shares of common stock of J. E. Linde Paper Company jointly owned by him and his two sisters." The fair market value of the common shares of J. E. Linde Paper Company was $38.50 per share on March 8, 1945. Opinion From all the facts, we have made the foregoing ultimate finding as to value which disposes of the only issue. *11 The various elements are diverse and to some extent contradictory. While the sales would ordinarily be the best evidence of value, Estate Tax Regulations 105, section 81.10 (c); Estate of William McDougall, 45 B.T.A. 803, the prices involved vary so widely and the surrounding circumstances are so limiting as to render dubious at best any definite conclusion based on them alone. See Gillette Rubber Co., 31 B.T.A. 483, 491. For example, the shares held as collateral by the company were taken in as payment of decedent's indebtedness at a price which would work out to some $60 a share. On the other hand, the Chairman of the Board of the company sold his shares for a price approximating $20. The largest block sold carried most of its consideration in long-term debentures, the value of which is as difficult to appraise as that of the stock itself. Going to the other factors, the company had earnings of about $3.50 a share as an average for the four years prior to decedent's death and its books showed an average per share value of $58 for the same period. See Rogers v. Helvering (C.C.A., 2nd Cir.), 107 Fed. (2d) 394, 396, affirming 31 B.T.A. 994. *12 Although no dividends had been paid, there is no apparent reason why the company's earnings should not eventually inure to the benefit of its common shareholders. We cannot accept petitioner's contention that the fair market value of the shares was to any extent reduced by the amount of annuities to be paid under the contract of purchase. That would no more reduce the value of the property than an agreement to pay the purchase price in installments. See Crocker v. Helvering (C.A.D.C.), 76 Fed. (2d) 974, certiorari denied, 296 U.S. 596. If there existed at decedent's death a continuing liability, susceptible of determination and computation - a point on which we express no opinion - it is as respondent suggests the subject of separate treatment by way of deduction rather than through diminution in the value of the property itself. Even if the payments were a charge or lien which by no means appears, the treatment by way of deduction would still be proper. Internal Revenue Code, section 812 (b) (4). The deficiency is redetermined in accordance with the dispositive finding of value. Decision will be entered under Rule 50.