HENRY S. PARKER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CRAIG COLGATE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ESTATE OF FRANK HAMILTON DAVIS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LOUIS DU PONT IRVING, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

P. ERSKINE WOOD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7081–7085. Promulgated May 14, 1928.

*Watson Washburn, Esq., Frank B. Washburn, Esq., David Cohen, Esq.,* and *C. C. Parlin, Esq.,* for the petitioners.
*George G. Witter, Esq.,* for the respondent.

OPINION.

MORRIS: While the two issues presented by the pleadings are similar in that they involve alleged profits derived from stock syndicate transactions we believe the facts and circumstances upon which the two issues are based warrant separate treatment and consideration. We will, therefore, first dispose of the question of whether the respondent committed an error in taxing as income certain alleged profits derived by the copartnership, Colgate, Parker & Co., of which the petitioners were partners, from the so-called Mercer Motor Stock Syndicate.

The petitioner contends that the Mercer transaction was not closed and completed in the year 1919 so as to render the income therefrom taxable in that year to the petitioners, regardless of whether or not the books of account of the partnership were kept on the cash receipts and disbursements basis or on the accrual basis. The respondent contends, on the other hand, that, when the purchase syndicate, consisting of the partnership and Kinne and Lyon, sold its holdings to the selling group (the partnership), this represented a closed transaction on which a definite gain or loss should be based.

Although we do not believe that the method of accounting employed by the partnership is dispositive of the issues here in controversy, we do believe that the importance attached to that question by the counsel for both parties requires a ruling as to whether the books of the partnership were kept on the cash receipts and disbursements basis as urged by the petitioner, or on the accrual basis as contended by the respondent. The books of account of the partnership were submitted in evidence in accordance with a stipulation entered into between the parties at the hearing with the understanding that the Board would determine the basis. We have carefully examined the books for the year 1919 and are of the opinion they were kept on the accrual basis. We find in the books of account large sums of accounts receivable, notes receivable, and securities on hand, notes payable and accounts payable of considerable amounts and innumerable other accounts from the very nature of which it would be practically impossible to correctly ascertain the net income for any given period without resorting to the accrual method of accounting. We also find that on December 31, 1919, the bookkeeper, anticipating the statement for the period, applied the customary rules of accounting procedure and set up a great number of accrual accounts reflecting interest accruing up to December 31, 1919, on stocks and bonds— in fact, we find all of the elements ordinarily present in a strict accrual system of accounting.

If the Mercer Motor Syndicate transaction was not substantially closed and completed in 1919, then the profits alleged by the respondent to have been derived therefrom are not taxable in that year. What constitutes a closed and completed transaction depends upon the facts and circumstances in each individual case. The Board has held in *Appeal of A. J. Schwarzler Co.*, 3 B. T. A. 535, where the petitioner was attempting to deduct an alleged loss in the year 1919 upon the ground that certain property was abandoned as worthless in that year, that the taxpayer could not deduct as a loss the cost of real estate and improvements where he still retains title thereto. In *Appeal of Sunflower Packing Corporation*, 2 B. T. A. 1104, one Burroughs was indebted to the taxpayer, which indebtedness was extinguished by deed to an orange grove owned by Burroughs. It appears that Burroughs had no other property through which the indebtedness could have been satisfied and that he took over the grove as a last resort for such value as it might have. The Board held that the exchange of the deed for the indebtedness was a closed and completed transaction in 1921 upon which the taxpayer was entitled to deduct the loss sustained by him in that transaction. In *Appeal of Webb Press Co., Ltd.*, 3 B. T. A. 247, the taxpayers had contracted to sell certain presses within the taxable year subject to inspection and acceptance upon completion. We held in that case that the transaction was not a closed and completed one until inspection and acceptance, which took place in the succeeding year.

The Mercer Motor Syndicate transaction began with the oral agreement entered into between the partnership and Kinne and Lyon in 1919, and continued up to March, 1920, when the syndicate agreement was terminated because of the failure of the participants to agree to a further extension of time. During all of that period the partnership as managers of the syndicate were attempting to procure participants to the syndicate agreement. On December 3, 1919, the partnership, finding that all of the Mercer stock had not been disposed of, extended the agreement to March 3, 1920.

If the partnership had succeeded in disposing of all the Mercer stock in 1919 and had all the participants carried out their obligation under the syndicate agreement and complied with the calls of the managers of the syndicate there would have been no necessity for an extension beyond December 3, 1919, and any gain derived would have been definitely determinable at that time, but the situation was quite different.

The purchase group, composed of Kinne, Lyon and the partnership, acquired the 89,000 shares of stock of the Mercer Automobile Co. under an agreement entered into between themselves that the

stock should be turned over to a selling group of which the partnership was manager, and that the stock be sold by said selling group and the profits divided, 50 per cent to Kinne and Lyon and 50 per cent to the partnership, to be paid as and when the stock had been sold and distributed and the transaction completed. A syndicate agreement was prepared, dated October 3, 1919, under which the partnership, as syndicate manager, was authorized by the participants whose names had been procured to purchase the shares in question from themselves at $35 a share. It is obvious that had the purpose of the syndicate been accomplished, that is, if participants had been procured for all the stock and none had defaulted, a handsome profit would have been realized. On the other hand, if participants could not be found for all of the stock, and if some of those procured defaulted, which was the case here, the partnership may have ultimately lost a considerable sum; at any rate, whatever profits that were made from the sales in 1919 may have been more than offset by losses sustained in 1920 when the remaining shares were to be sold. How much profit, if any, was to be derived from this transaction could only be determined as final calls were made upon the participants in March, 1920, to comply with their agreements at which time a number of them failed to respond.

The circumstances in which the partnership was placed were made even more precarious when we consider the fact that the market for Mercer stock during the period of time under consideration was being artificially stimulated by pool operations and that the stock went from $39 a share in January, 1920, to $2 a share in December, 1920, and that shortly thereafter it became absolutely worthless. Had the market not been supported by these pools while the stock of the syndicate was being sold the value of the shares in the hands of the syndicate would no doubt have been considerably less and consequently a very considerable loss would have been evident in 1919 even before the expiration of the syndicate agreement.

The respondent attached considerable importance to the book entry made by the partnership's bookkeeper at December 31, 1919, reflecting a profit in that year of $267,514.27 from the Mercer Motor Syndicate. The testimony shows clearly that this entry was unauthorized, and furthermore, that it was corrected in March, 1920, when discovered by the partners. Books are merely prima-facie evidence of the facts contained therein and the fact that the bookkeeper improperly made this entry in the books of account in 1919 does not foreclose the partners' right to show that the entry was improper and unauthorized. *Appeal of Henry Myer Thread Manufacturing Co.*, 2 B. T. A. 665.

Under the circumstances of this case we are of the opinion that the respondent improperly taxed the alleged profits derived from the Mercer Motor Syndicate transaction in 1919 and that this transaction was not a closed and completed one until March, 1920, when the syndicate agreement expired.

The second allegation of error urged by the petitioners is with respect to the taxability of alleged profits derived from syndicate transactions in stock of the Invincible Oil Co. The petitioner contends that the Invincible Oil stock transactions constituted a single inseparable whole which was not completed for income-tax purposes in 1919, and that even assuming that the transaction is divisible, the fair market value of the Invincible stock received in exchange for stock of the Louisiana Oil Corporation stock subject to restrictions placed thereon, was much less than the cost of the Louisiana Oil stock turned in in exchange and that, therefore, no profit was realized on the exchange.

There was no evidence on some of the details of this transaction which would have facilitated a consideration of the question involved. Even the testimony of the two witnesses called was indefinite and at times conflicting on features of the transaction which counsel endeavored to place in evidence, and other facts which enter into the computation of the amount of the income, if any, were apparently not in controversy but were not placed in the record for our consideration. The decision is therefore limited to the general question presented.

In May, 1919, the partnership entered into an agreement with Bache & Co. and Cochrane, Harper & Co. to jointly purchase some 210,000 shares of stock of the Invincible Oil Corporation, it being understood that a certain number of shares of stock of the Louisiana Oil Corporation (of which number the partnership's portion was 10,000 shares), were to be exchanged for Invincible Oil stock in the ratio of five for six. Viewing the circumstances surrounding these transactions, in the light of the understanding of the parties and their acts in carrying out these transactions, we are of the opinion that the exchange of Louisiana Oil stock for and the purchase of 210,000 shares of Invincible Oil stock constituted a single inseparable transaction and we shall so consider them.

The partnership received 11,947 shares of Invincible Oil stock in exchange for 9,955 shares of Louisiana Oil stock and the syndicate having disposed of the 120,000 shares of the 220,000 shares of Invincible Oil stock which it acquired, the partnership received as its pro rata portion 30,000 shares, a part of which other parties were entitled to, due to the partnership's allowing them to participate in

the transaction. The partnership also acquired 10,000 shares of Invincible stock in the pool operations.

On June 6, 1919, the partnership entered into agreements restricting the sale of 30,000 shares of Invincible Oil stock until December 15, 1919, which agreement was superseded by another writing of June 28, 1919, reducing the restriction to 10,000 shares. There was also an agreement entered into by the partnership restricting the sale of the 11,947 shares of Invincible Oil stock which had been received for Louisiana Oil stock to September 15, 1919.

The partnership having refused to join further in the pool operations theretofore carried on, the parties on June 28, 1919, entered into a further agreement under which the partnership sold to the other parties to the syndicate 10,000 shares of Invincible Oil stock for $30 per share, said stock to be delivered by the partnership " at any time between December 20, 1919, and January 10, 1920—the exact date of delivery to be at the option of the party of the first part (the partnership)." That agreement also gave to the other parties of the syndicate a six-month option to purchase 10,000 shares of Invincible Oil stock from the partnership at $37.033251 per share and also a further option to purchase 10,000 additional shares at $30 per share to expire " upon the date upon which payment is to be made for the (10,000 shares) purchased and sold under paragraph ' I ' hereof." Paragraph " I " referred to, provided for delivery and payment at any time between December 20, 1919, and January 10, 1920.

It is not absolutely essential that every detail of a transaction must have been closed in order to render a transaction closed and completed for income-tax purposes. In 1919 the partnership had received its proportion of the profit from the purchase and sale of the Invincible stock in the form of stock of that corporation, it had received the stock from the exchange of Louisiana stock, and under the agreement of June 28, 1919, it withdrew from the pool, thereby relieving itself from any further obligation thereunder. It therefore seems clear to us that the Invincible Oil Syndicate was a closed and completed transaction within the year 1919. The best that could be said, taking the most favorable attitude, is that the syndicate remained alive and active due to restriction and option until on or about December 28, 1919, or six months from June 28, 1919, at which time the partnership was obligated to produce 10,000 shares of Invincible Oil stock in compliance with the option granted in article 3 of the agreement of June 28, 1919, set forth in the findings of fact herein.

Having concluded that the several component parts of the Invincible Oil Syndicate constitute an inseparable whole, and also that

the syndicate transaction was closed and completed in the year 1919, it becomes necessary for us to consider whether the stock of the Invincible Oil Corporation had any fair market value in 1919 when received. If it did not, then the profit from the transaction should not be reported until the stock was sold.

The testimony of witnesses convinces us that stock subject to restrictive agreements has a lower value than stock which is free and unrestricted. The amount of depreciation which takes place as a result of these restrictive agreements it seems depends upon the nature of the restriction and the length thereof. In *Appeal of Wallis Tractor Co.*, 3 B. T. A. 981, where the fair market value of shares of stock received by the taxpayer under an agreement to retain certain of them for an indefinite period and the others for a period of at least two years, the Board held that the quotation for that stock on the Chicago Stock Exchange was no basis for the determination of fair market value for those shares at the time they were received by the taxpayer.

While the restrictions in the instant case are not as burdensome as those in the *Appeal of Wallis Tractor Co.*, *supra*, we are of the opinion that stock exchange quotations under the circumstances here related are not determinative of the fair market value of the stock of the Invincible Oil Corporation at the time it was received by the partnership. Let us, therefore, determine if possible just what the fair market value of this stock was.

The Circuit Court of Appeals in *Walter* v. *Duffy*, 287 Fed. 41, said:

Now, what is the market price? What is the fair market price of the statute? We say "fair," since every word used by Congress must be given due effect in the construction of this widely applicable statute, for obviously, while a stock might be bought and sold—and so marketed—and might thus be said to evidence some market price, yet it is obvious that Congress by the addition of the words "fair market price," certainly meant that not only must the market price be ascertained by sales, but that sales so made, the circumstances under which they were made, the subject-matter of the sales, all the attendant circumstances, were to be considered to determine whether such sales served to evidence not alone a market sale, but the fair price which Congress said should be the statutory start or base from which subsequent "gain derived" should be determined.

We start, then with the fact that we are here dealing with the existence of a market, and a market price evidenced by sales in such market; so that our first and basic inquiry is whether there actually was a market for the sale of this insurance stock. Now, market implies the existence of supply and demand, for without the existence of either factor no market value is shown. Standing alone, offers to sell, with no takers, or offers to buy, with no sellers, show no such concurring willing action of buyer and seller as is involved where a market is made by buyers and sellers who by their respective sales and purchases make a market price which the law takes as evidence of value.

The District Court for the Western District of Pennsylvania in *Phillips* v. *United States*, 12 Fed. (2d) 598, the court said in considering the question of fair market value:

It is well settled that the fair market price or value of the property as of March 1, 1913, is a question of fact under all the circumstances of the case. No method of determining this value can be stated which will adequately meet all circumstances. The stock sales made from time to time are to be considered together with the nature and extent of the sales, and the circumstances under which they were made; hence forced sales, or sales of small lots may ·cften be no real indication of the value. The test is the fair market value. This may be defined to be the value of the property in money as between one who wishes to purchase and one who wishes to sell; the price at which a seller willing to sell at a fair price, and a buyer willing to buy at a fair price, both having reasonable knowledge of the facts. Prior to 1924, it appearing that the Treasury Department, in valuing the stock of close corporations, had given insufficient weight to the value of the assets and too great weight to forced or isolated sales of comparatively small blocks, there was inserted in the Revenue Act of 1924, 43 Stat. 259 (Comp. St. Supp. 1925, Art. 6336–1/6 bbb), these words:

" In determining the fair market value of stock in a corporation as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date."

When one of the. petitioner's witnesses was asked what the fair market value of the Invincible stock received for Louisiana Oil stock was, subject to these restrictive agreements, the witness replied, " I do not know. I do not know what they could have been sold for, subject to such a restrictive agreement." When questioned further on this subject and asked if he would say that the stock subject to such agreements had no fair market value, he replied, " I would say I do not know what the market value would be." Therefore, it will be seen that this witness's testimony is of very little aid in solving the question of fair market value. The only other witnesses offered, when asked whether the Invincible Oil stock received in exchange for Louisiana Oil stock subject to such restrictive agreements had a fair market value, said " The thing had no fair market value," yet in the same breath he states " you might get somebody to take it off your hands at a preposterous value, of 50¢ a share, or $1.00 a share, or $5.00 or something like that." The same witness testified that Invincible Oil stock had some market value, just what, it was impossible to tell. We are of the opinion, considering the testimony of the witnesses, that the Invincible Oil stock did have some fair market value notwithstanding the restrictive agreements at the time these shares were received by the partnership.

We know little or nothing about the assets of the Invincible Oil Corporation and consequently can not resort to the assumption that the shares received had the same value as the assets of that corporation as was done in *Appeal of Wallis Tractor Co., supra.*

The partnership and others interested in the Invincible Oil Stock Syndicate purchased those shares of stock in May, 1919, for $16.3636 a share. It appears that an investigation was made of the Invincible Oil properties prior to purchasing these shares. Although the restrictions in question were not placed upon these shares until the following month, the necessity therefor was no doubt within the minds of all of the parties interested in the syndicate. Realizing, as they must have, that restrictions would be placed upon the stock when acquired, and knowing the effect of such restrictions upon the value of shares, they must have considered that the fair market value of the stock of the Invincible Oil Corporation was no less than the amount paid therefor. We are, therefore, of the opinion that the best evidence of the fair market value is the value placed upon these shares at the date of acquisition, or $16.3636 a share. In determining the profit or loss for 1919 from the Invincible Oil stock transaction the fair market value of $16.3636 per share, as hereinabove determined, should be used.

The petition of Frank Hamilton Davis contained an allegation of fact with respect to additional profit of $4,108.66 found by the respondent on account of 153 shares of Mercer Motors stock received by the members of the partnership outside the syndicate account. From the evidence offered, we are unable to determine whether these shares constituted a part of the Mercer Motors Syndicate hereinabove disposed of, and we will therefore sustain the findings of the respondent as to that allegation.

Reviewed by the Board.

> *Judgment will be entered on 15 days' notice, under Rule 50.*