T. W. HENRITZE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

NELL HENRITZE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

T. R. HENRITZE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

J. B. HENRITZE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 60606–60609.   Promulgated August 18, 1933.

*J. R. Sherrod, Esq.*, for the petitioners.
*J. M. Johnston, Esq.*, for the respondent.

OPINION.

STERNHAGEN: The petitioners, having owned all of the shares of the Snodgrass Co., carried out an agreement whereby they first exchanged such shares for cash and shares of the Delaware corporation and then immediately exchanged the shares of the Delaware corporation for shares of the Maryland corporation, thus leaving the parties in the same situation as if there had been a technical merger or consolidation of the Snodgrass corporation and the Maryland corporation. There was, therefore, a statutory reorganization, sec. 112 (i) (1), Revenue Act of 1928. *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462; cf. *Minnesota Tea Co.*, 28 B.T.A. 591. Upon this the parties agreed.

The issue arises from the respondent's determination that in such reorganization the petitioners realized gain and that such gain must be recognized in accordance with sec. 112 (c) (1) and taxed to the extent of the cash received. The petitioners contend not that 112 (c) (1) is inapplicable, but that the fair market value of the shares received, with cash, for their Snodgrass shares is to be taken as zero, because, since the petitioners were bound, during the year of acquisition, not to sell their shares without the bankers' consent, there was no market therefor and hence no fair market value. A secondary

contention is that if any fair market value is to be recognized for the shares, it is in fact less than that determined by respondent.

1. A contractual obligation assumed by the recipient of shares not to exercise an owner's right of sale does not as a matter of law establish the absence of fair market value. *Newman* v. *Commissioner*, 40 Fed. (2d) 225; rehearing denied, 41 Fed. (2d) 743; certiorari denied, 282 U.S. 858; *Henry S. Parker*, 11 B.T.A. 1336, 1350; *H. H. Champlin*, 28 B.T.A. 264; *Tex-Penn Oil Co.*, 28 B.T.A. 917. The restrictive provisions, although stamped upon the share certificates are not inherent attributes of the shares. Between the corporation and the shareholder exist all of the normal legal incidents of such a relation. The restriction deprives the shareholder of none of his rights *qua* shareholder and adds nothing to either the rights or duties of the corporation. Held, for example, by a trustee prohibited by the trust to sell, they would nevertheless have full market value. Like any other property, such as land, buildings or chattels, they may have substantial fair market value despite a local or temporary obstacle to their cash realization by the one who happens to own them at a given time:

The very purpose of the restriction in this instance is shown by the evidence to be for the protection and enhancement of value rather than its destruction. The hypothesis of fair market value is the existence of willing seller and willing buyer, and it is a manifest anomaly to attempt an ascertainment of what a willing seller would take in respect of property which by reason of a voluntary contractual inhibition he has made himself unwilling to sell. Could it be said, for example, that one who receives as compensation for services a marketable railroad bond, with the agreement with his employer that he will not sell it for a year, has received nothing of fair market value? Cf. *Harry B. Hurd*, 12 B.T.A. 368; *H. L. Carnahan*, 21 B.T.A. 893. Instances of wide diversity come to mind which would make the statute incredibly vulnerable. It has been held in other connections that taxpayers may not, by private contracts or definitions, determine their income tax liability. *Lucas* v. *Earl*, 281 U.S. 111; *Mitchel* v. *Bowers*, 15 Fed. (2d) 287; certiorari denied, 273 U.S. 759; *Phelps* v. *Commissioner*, 54 Fed. (2d) 289; certiorari denied, 285 U.S. 558. And the doctrine is, we think, applicable to a contractual restriction upon the sale or disposition of income received. The petitioners' point, therefore, that because of the restrictive clause upon the shares they were without fair market value, is rejected.

2. Since the shares have been held by the respondent to have a fair market value when received and the petitioners have not shown that they are without fair market value, it is necessary to consider

the petitioners' secondary contention that the fair market value determined by the respondent is too high. They claim that the value was not more than $2.81 a share. At the time, in September 1929, when the MacMarr shares were received by petitioners, such shares bearing no restrictive clause were the subject of active daily trading on the New York Curb. Prices, it is agreed, were from 40 to 40½. We have found as a fact an average price of $40.25 per share, which is the figure used by the respondent in determining statutory gain. While the evidence indicates that this trading price was affected in some way by the " manipulation " of the bankers, there is nothing to indicate that there was other than a free market or, if the market were other than free, how else a free market would have operated upon the price. Cf. *Walter* v. *Duffy*, 287 Fed. 41. Quite clearly, book value of either or both the Snodgrass and MacMarr properties and business did not reflect the value of the shares, for the public seems to have felt that the future was more important than either past experience or book value. The MacMarr shares, it must be remembered, were not merely the substitute for the Snodgrass shares so as to reflect the history of the Snodgrass Co. alone, but represented an amalgamated and constantly expanding business which was absorbing others more or less like Snodgrass. From the evidence it is impossible to appraise the MacMarr shares with reference only to the history of the businesses which those shares represented when received by these petitioners. While there is evidence to show that earnings actually dropped from 1929 to 1930, it can not be assumed, contrary to the optimism of the market which the record otherwise discloses, that this drop was reasonably in prospect at the valuation date of September 17, 1929; and if it was reasonably in prospect, it must have been a factor of the market appraisal at $40.25 a share.

There seems to be no escape, therefore, in this record from the treatment of the curb market price for actual sales as the fair market value of the shares. It is not necessary in this case to go so far as to say that the measure of value to be applied to such restricted shares is always or as a matter of law the stock exchange price of unrestricted shares. Whether in fact this is generally true may remain to be seen. In this case, however, the evidence fails to demonstrate that the fair market value of the shares received by these petitioners was less than the price fixed by traders on the curb.

The respondent's determination as to value is therefore sustained.

3. In computing the deficiency the respondent determined that all of the income received by the petitioners in the reorganization was ordinary income or capital gain. The petitioners contend, apparently under section 112 (c) (2), that a portion of the cash received was in distribution of surplus of the Snodgrass Co. and therefore

taxable as dividends subject to surtax only. The respondent makes no mention of this, either in the notices of deficiency or in his argument. The evidence shows that on September 17, 1929, the Snodgrass Co. had a surplus of $391,073.51, and it is therefore apparent that to this extent the cash distributed must be treated as dividends to the petitioners and the deficiencies modified accordingly.

*Judgment will be entered under Rule 50.*