## KRAUSS v. UNITED STATES (two cases).
### Civil Actions Nos. 475, 476.
District Court, E. D. Louisiana,

New Orleans Division.

Aug. 5, 1943.

Milling, Godchaux, Saal & Milling and Irving R. Saal, all of New Orleans, La., for plaintiffs.

Herbert W. Christenberry, U. S. Atty., of New Orleans, La., for defendant.

CAILLOUET, District Judge.

The record of each of the abovementioned two causes contains a comprehensive stipulation upon which (other than the restricted testimony of one witness relating to a few comparatively unimportant facts, existence of which is not denied) this Court is to render decision.

Said stipulation provided (subject, however, to the approval of the Court) for the consolidation of the two causes for trial but not for entry of judgment. Accordingly, the trial had, was of both causes.

In the first case, Frederick Krauss seeks an aggregate refund of $8,900.02, with 6% per annum interest, until paid, on $3,938.17 thereof from August 23, 1938, and on

$4,961.85 thereof from September 26, 1938, alleging that the said two component amounts were paid by him, on the respective dates from which interest is claimed, to the Collector of Internal Revenue then acting at New Orleans, La.; he alleges that the $3,938.17 and the $4,961.85 are the amounts, in principal and interest, of alleged deficiencies in gift tax payments for the calendar years 1936 and 1937, respectively, demanded of him by said Collector and which complainant paid, although said amounts were not lawfully due, only in order to prevent the continued accruing of interest and such expense as would have attended further proceedings under such official demands; and he further alleges that he, thereafter, duly filed two claims for refund of said respective amounts, fully complying with all applicable legal requirements, but that the Commissioner of Internal Revenue disallowed such claims in their entirety, giving claimant written notice thereof by registered mail on March 8, 1939, as all of which appears in greater detail by the Exhibits "A", "B" and "C" attached to and made to form part of the complaint.

Max Krauss appears in the second case as the judicially recognized universal legatee and sole heir of the late Alfred Krauss, who died on January 7, 1941, and of whose entire estate complainant was sent into possession, in due course; he seeks an aggregate refund of $3,639, with like 6% interest, until paid, on $3,288.29 thereof and on $350.71 thereof, respectively, from August 23rd and September 26, 1938, when said Alfred Krauss is alleged to have paid the said two component amounts, under similar circumstances as attended the payments by Frederick Krauss; after which, again in like manner and with like result, said Alfred Krauss is represented to have filed claims for refund, as all appears in greater detail by reference to the Exhibits "X", "Y" and "Z" attached to and made to form part of said Max Krauss' complaint.

The material facts in each case are undisputed.

Frederick Krauss and Alfred Krauss paid to the Collector of Internal Revenue for the calendar years 1936 and 1937 what they represented, in their respective gift tax returns for said years, to be the proper amounts of gift taxes each owed on donations that he had made, after compliance with certain charter restrictions governing the stock transfers, to their niece and nephew, as follows, to-wit: Frederick Krauss, in 1936, to his niece, 470 shares of Class "A" stock of the Krauss Company, Ltd., and 410 shares to his nephew, and in 1937, to each, 245 more of such shares; and Alfred Krauss in 1936, to said nephew and niece, each 410 shares of said Class "A" stock, and in 1937, to each, 50 more of such shares.

The donors each calculated the gift taxes involved on the basis of 60% of the actual book value of said Class "A" shares, as shown by the last preceding monthly trial balance of the corporation. Upon examination of their gift tax returns, the Commissioner of Internal Revenue determined what he claims to be proper amounts of such gift tax, using the full book value of the donated shares, at the time of donation, as the legal basis for the computations; and the deficiency assessments aforementioned were thereupon imposed.

The plaintiffs now contend as was done heretofore before the Commissioner, that 60% of such book value and not the 100% so substituted, was and is the legal basis for computation of the gift taxes at issue; they so maintain, say they, because the the restrictive provisions in the corporation charter relating to the transfer of Class "A" shares, specifically provide that "no stockholder may sell, pledge, assign or transfer. any Class "A" stock, except to another record holder of Class "A" stock, without giving notice of such intention to the other record holders of both Class "A" and Class "B" stock, who shall have the right, for a period of sixty days, to purchase all of the Class "A" stock of such stockholder at 60% of the book value thereof as shown on the last preceding monthly trial balance." And plaintiffs cite, as authority in support of their said contention, the case of Lomb v. Sugden, Collector, 2 Cir., 1936, 82 F.2d 166, and the authorities therein cited, particularly Wilson v. Bowers, 2 Cir., 1932, 57 F.2d 682, and Helvering v. Salvage, etc.. 1936, 297 U.S. 106, 56 S.Ct. 375, 80 L.Ed. 511, as well as the later case of Commissioner of Internal Revenue v. Bensel, 3 Cir., 1938, 100 F.2d 639.

Rejecting plaintiffs' said claims for refund, the Commissioner expressed himself as concluding that the cases cited were inapplicable because in none was the factual

set-up similar, in any material manner, to the facts then and now under consideration.

In the last mentioned Bensel case, for instance, there was involved the settlement of a serious business problem, a dealing at arm's length between a father, majority stockholder of a corporation, and his son, valued business executive of the corporation; the two had been estranged for many years and the father, in order to insure the retention of his son's services to the corporation, yielded to his demand that he be granted an option to buy the father's stock at his death, for the price then agreed upon, which was high in relation to current sales of the stock at the time; upon the father's death, the son exercised his option and purchased the stock at said price, which was not the stock's full value at time of death. The Commissioner of Internal Revenue sought to have included in the deceased father's gross estate, for purposes of the Federal estate tax, the excess of the fair market value, at death, over the stock's option price; but the Court held that this was not justified, since the value of the gross estate of the decedent was to be determined by including the value "at the time of his death" of all property, real or personal, etc., and the value of the stock in question at the father's death was not full value but the price previously fixed by valid contract between father and son.

In the Salvage case, which was before the United States Supreme Court on writs of certiorari to the Circuit Court of Appeals for the Second Circuit, the facts were, substantially, that Salvage prior to 1922 bought 25 shares of Viscose Company stock at $166.66, paying $4,166.66. In December 1922, he acquired from the company 1500 more shares at $100 each, paying $150,000 and obligating himself to "refrain from competing business, etc." and agreeing that the company might re-acquire 5/7ths of said 1500 shares at par, in 1923, 4/7ths in 1924, etc. "Intrinsically (when unincumbered) a share of the company stock", so found the Supreme Court, "was then worth $1164.70".

Later, during 1922, the Salvage 1525 shares were exchanged for 6100 preferred shares, redeemable at $110, and 7625 common shares of the American Viscose Corporation, the basis of exchange having been 4 preferred and 5 common of the new for 1 share of the old.

During 1929, the preferred shares were redeemed, Salvage receiving $671,000 and his income tax return for that year disclosed a net capital gain in the sum representing the difference between the amount so received and his total original outlay of $154,166.66 for the 1525 aforementioned shares; and upon this, he paid the assessed tax.

An audit having been made, the Commissioner of Internal Revenue ruled that apportionment of cost between the preferred and common shares should have been, and should be, made; 37 plus per cent. of the cost was assigned to the preferred and 62 plus per cent. to the common, and a deficiency assessment of $12,005.38 followed, as the result of such action. Salvage countered, in the main, that $1,164.70 was the fair market value of each of the original 1525 shares in 1922 and that, using this figure as representing basic cost, no taxable gain arose upon the aforementioned redemption of the preferred shares in 1929.

The Circuit Court of Appeals, which disapproved of the deficiency assessment, had held that the consideration which passed for Salvage's acquisition from the former Viscose Company of 1500 shares of its stock, in 1922, was $100 per share, plus the covenants to re-sell 5/7ths at par, etc., and not to engage in competing business, and the Supreme Court said that it saw no reason to disagree with this and other findings of the court below. The Supreme Court's decision [297 U.S. 106, 56 S.Ct. 377, 80 L.Ed. 511] further reads, in part, viz.: "Considering the option to repurchase at par, outstanding in 1922, there could be no proper finding of fair market value at that time in excess of $100 per share. In the circumstances, the court did not err in so holding."

In the Wilson v. Bowers case, it was held that inasmuch as the value of the stock there at issue was to be determined, for purposes of inheritance taxation, as of the time of death and since there then existed a valid enforceable option to purchase said stock at a named fixed price at any time within four months from and after the qualification of the deceased testator's executors, the fair market value of the stock was no more than that previously fixed purchase-option price.

Finally, there remains to be considered the Lomb v. Sugden case, which was

decided in 1936 by the same court, and was heard by the same three judges, as was the Wilson v. Bowers case, in 1932.

On May 16, 1928, a Mrs. Lomb, stockholder, joined with all of the other stockholders of the Bausch & Lomb Optical Company, including her husband, Carl F. Lomb, in the execution of an agreement whereby all were prohibited from selling any of their respective share-holdings without first offering the shares sought to be sold to all other stockholders, who were to have the right to purchase "in proportion to their respective common stock holdings" and at a price which, when computed in accordance with the terms of said agreement, amounted to $69.445 per share; it being specifically provided, furthermore, that no stockholder might sell any of the stock "whether now owned or hereafter acquired, to any other person or party not a party to the agreement without offering to sell the same to all of the other common stockholders of said company who are parties hereto"; upon failure of the other stockholders to purchase, prior offer having been made in accordance with the terms of the agreement, then the offered shares might be sold to outsiders. Permission was granted for disposal by will of a stockholder's shares (in the absence of surviving issue) to any other stockholder, or of even as much as 10% of the decedent's stock holdings to outsiders. But if no issue were left, and to the extent that there was no disposal by will, then the decedent's executors and/or administrators were under the absolute obligation to offer his stock, at the aforementioned limited price of $69.445 per share, to the surviving members of the group, in proportion of their respective stock holdings, and in the event that they refused to purchase, then decedent's representatives might sell the stock without restriction.

Mrs. Lomb died on October 3, 1929, owning 1500 shares which she had willed as part of her residuary estate to her husband and fellow-stockholder as sole residuary legatee, and who she designated her testamentary executor.

For the purposes of the Federal estate tax, the Commissioner of Internal Revenue established the value of the stock so forming part of the decedent's gross estate, disregarding the predetermined price limitation thereof and assessing it at $100 per share. There followed a tax deficiency assessment of $370.46, which sum, after the executor had paid, he sued to recover; but the District Court dismissed his said action for refund, holding that the price limitation had never been enforceable by specific performance and was, therefore, not binding upon the Commissioner in his official assessment of the Federal estate tax. The Circuit Court of Appeals found this to be error and referred to the fact that in Wilson v. Bowers it had decided that an option contract giving stockholders the right to purchase at a specified price, upon the owner's sale or from his estate, limited the value of the stock at issue, for the purposes of inheritance taxation, to the low price at which he or his executors were obliged to sell; and then, the Court observed that it saw no essential difference between that case and the one under consideration. After which, the Court's decision proceeded, in part, as follows, to-wit: "The transferees of the decedent here would necessarily be either members of a group of stockholders who were mere donees, or else would be members of a group of stockholders who had the privilege of purchasing the shares at the limited price of $69.445 per share. In either case the decedent had stock which she was obliged to give away or to sell at $69.445, if members of the group were willing to pay that price (30 per cent. less than the assessed value) for the proportion of the stock offered for sale to which each was entitled under the agreement. As Holmes, J., said in Edwards v. Slocum, 264 U.S. 61, 63, 44 S.Ct. 293, 68 L.Ed. 564, quoting from Knowlton v. Moore, 178 U.S. 41, 49, 20 S.Ct. 747, 44 L.Ed. 969, the tax is on 'not the interest to which some person succeeds on a death, but the interest which ceased by reason of the death.' Mrs. Lomb at the time of her death was restricted to a price of only $69.445 because she was obliged either to donate her stock to the other stockholders or to offer it to them at that low price. In either event that price was the most that she could obtain for her stock in the natural course of events." [82 F.2d 167.]

These present Krauss cases are readily distinguishable from any of those relied on by plaintiffs, as claimed authority supporting their contention that the gift tax assessments of the stock here involved on the basis of full value, rather than at 60% thereof, are erroneous.

Krauss Company, Ltd., has always been a closed family corporation, as early as

1920 there having been but five stockholders, Leon Heymann then owing 51% of the capital stock (all of the Class B issue), and his wife's four brothers sharing the remaining 49% thereof (all of the Class A issue). To this day no change has taken place in this situation, except that the said Heymann's two children were donated stock by their uncles and two of the four brothers have died. The two surviving brothers-in-law and the two Heymann children together now own the entire issue of said Class A stock.

Before there were made, in 1936 and 1937, the gifts of stock discussed herein, the charter of the corporation was amended in several particulars, but notably in these respects, to-wit:

No stockholder might validly "sell, pledge, assign or transfer" any of the corporation's Class A stock, "except to another record holder" of its Class A stock, without prior written notice of his intention to take either one or more of said actions, delivered to each other record holder of Class A stock, and Class B stock as well, in either of the two ways which were minutely detailed; within sixty days from delivery of the last of such notices, the other record holders of Class A and Class B stock might then purchase, on specified terms including a provision for discharging the purchase price partly cash and in three equal credit installments, all of the Class A stock of the shareholder in interest, at "60% of the book value thereof as shown on the last preceding monthly trial balance" of the corporation; whenever the employment of any stockholder owning Class A stock was terminated "other than by death", the other record holders of Class A and Class B stock might purchase, within sixty days from such termination and on the terms referred to hereinabove, all of the Class A stock of said former employee of the corporation, at the like limited price of 60% of the stock's book value; in either of the two situations so provided for, it was only the other record holders of the Class A stock who might so purchase within the first forty of the sixty days purchase period; if any of the Class A stock so subject to disposition remained unbought at the close of said first forty days, then the record holders of Class B stock might buy; and if any of said mentioned Class A stock remained undisposed of at the close of the sixty days purchase period, then the shares at issue might be "sold, pledged, assigned or transferred without restrictions".

Special provisions were made for purchases proportionate to the buyers' respective record holdings, if at any time the other record holders respectively notified, in the manner also prescribed by the charter, of their intention to purchase an aggregate of more shares than were made available for sale.

It may be said, in passing, that the sole distinction made between the Class A and the Class B stock was that the latter had exclusive power to vote for the corporation's dissolution, and that when, as aforementioned, Frederick Krauss and the late Alfred Krauss each made his two donations of Class A stock to his niece and his nephew, children of Leon Heymann, the said father owned 10,200 shares or the total issue of the Class B stock, which constituted the majority, in number and voting rights, of all of the corporation's authorized and outstanding stock, which was an aggregate of 20,000 shares of said Classes A and B.

It is to be noted that any shareholder of this family group (which never numbered more than six) was at liberty to "sell, pledge, assign or transfer" any of his Class A stock without restriction whatever, if he dealt with another record holder of the corporation's Class A stock; there was no question then of a price limitation in an amount equivalent to 60% of the stock's book value; such shareholder was never under obligation to sell his stock at such a low price, nor was his estate, except if he elected to offer the same to other record holders of Class A and Class B stock as necessary act precedent to his dealing with non-shareholders; he might keep his stock and derive therefrom all such benefits as might accrue in the shape of cash or stock dividends, or share ratably in the distribution of net corporate assets should the corporation be dissolved; he might exercise the stock's voting rights and might dispose of such stock by last will. Such shareholder was neither required to sell nor was he prohibited from selling; only if he chose to deal, by sale, pledge, assignment or transfer, with another person than a record holder of Class A stock was he put to the necessity of offering his stock for sale to all of the other record holders of such Class A stock, and Class B stock as well, at the aforementioned limit-

ed price, equivalent to 60% of the then existing book value of such stock. See: Estate of James Smith v. Commissioner of Internal Revenue, 1942, 46 B.T.A. 337.

To the extent that price limitation was effectively provided for within the narrow limits indicated by the charter provisions, the shareholders may have been bound thereby, but this did not restrict the Government in the exercise of its undoubted right to levy and collect gift taxes upon the actual value of the donated stock, as of the date of gift. City Bank Farmers Trust Co., Executor, et als. v. Commissioner, 1931, 23 B.T.A. 663; Henritze v. Commissioner, 1933, 28 B.T.A. 1173.

The gift taxes at issue were levied under the Revenue Act of 1932, c. 209, 47 Stat. 169, 26 U.S.C.A. Int.Rev. Acts, page 475 et seq. and Section 506 thereof prescribed that the value of the property donated at the date of the gift was to be considered the amount of such gift for calculating the gift tax due. Section 507 required the doner to file a return covering the transfer by gift made by him during the calendar year; Section 511, that the Commissioner of Internal Revenue should examine such return and "determine the correct amount of the tax"; and Section 513 provided for the course to be followed should the Commissioner determine that the return reflected a deficiency in the gift tax actually imposed by the law.

As was said in the case of Roth v. Wardell, 9 Cir., 1935, 77 F.2d 124, 125, the question of valuation "is so peculiarly one of fact that the decision of the Commissioner will rarely be overturned. It cannot be overturned by the court if there is substantial evidence to support it".

The book value of the stock of Krauss Company, Ltd., at the time of each donation, was established by the plaintiffs themselves, and the law requiring that the value of each lot donated, as aforesaid, should be considered the amount of the gift, the Commissioner, charged as he was with the duty of determining the correct amount of the gift tax to be paid, accepted such book value as satisfactorily indicative of the true value of the donated property at the date of the gift, in contrast to the 60% thereof represented by plaintiffs to be such true value.

The presumption is that the taxes paid were rightly collected upon assessments correctly imposed by the Commissioner, and the burden rested upon the plaintiff to prove all the facts necessary to establish the illegality of the collection. Reinecke v. Spalding, 1930, 280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385; Niles Bement Pond Co. v. United States, 1930, 281 U.S. 357, 50 S.Ct. 251, 74 L.Ed. 901; Helvering v. Taylor, 1935, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623; Atlanta Casket Co. v. Rose, Collector, 5 Cir., 1927, 22 F.2d 800; J. & O. Altschul Tobacco Co. v. Commissioner of Internal Revenue, 5 Cir., 1930, 42 F.2d 609; Crowell v. Commissioner of Internal Revenue, 6 Cir., 1932, 62 F.2d 51; Heiner v. Gwinner, 3 Cir., 1940, 114 F.2d 723; Kline v. Commissioner, 3 Cir., 1942, 130 F.2d 742, certiorari denied by Supreme Court, 317 U.S. 697, 63 S.Ct. 440, 87 L.Ed. ——.

Under the circumstances, the Commissioner's valuations must be sustained, and the parties having specifically stipulated that his acts being upheld neither plaintiff is entitled to recover anything, there should be a judgment entered in each of the two causes, so tried together, dismissing the same at plaintiff's costs.

The Court having duly considered defendant's written request, in each case, for allowance of its prepared findings of fact and conclusions of law, the same are so allowed and are adopted as the Court's formal findings of fact and conclusions of law.

Let judgment dismissing the plaintiff's action, with costs, be now entered in each of said two cases.