Estate of Leon N. F. Blanchard, Deceased, Wallace H. Blanchard and Annie B. Blanchard, Executors v. Commissioner.
Estate of Leon N. F. Blanchard v. Commissioner
Docket No. 12752.
United States Tax Court
1949 Tax Ct. Memo LEXIS 10; 8 T.C.M. (CCH) 1088; T.C.M. (RIA) 49292; December 21, 1949
*10 Philip Klein, Esq., and Milton M. Unger, Esq., 744 Board St., Newark, N.J., for the petitioners. Maurice S. Bush, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of deficiencies in income tax for the calendar years 1942 and 1943 of $34,322.52 and $190, respectively. The only question is the fair market value at decedent's death of 402 shares of Prudential Insurance Company stock subsequently sold by petitioner. The parties have filed a stipulation of facts. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner, the estate of decedent Leon N. F. Blanchard, by its executors, filed Federal fiduciary income tax returns for the years in question with the collector of internal revenue at Newark, New Jersey. Prudential Insurance Co. of America, hereinafter called the company, was incorporated in 1873 under the laws of New Jersey with an authorized capital of $25,000 divided into 500 shares of $50 par value common stock. In 1893 it had outstanding 40,000 shares of $50 par value common, or an aggregate of $2,000,000. No additional stock *11 has been issued since 1893, and the company has been limited by law since 1907 to a capital of $2,000,000. From 1886 to 1907, the company issued life insurance policies known as deferred dividend life policies which entitled the holders to participate in dividend payments. By the end of 1907, the company had an undivided surplus of $15,616,716.52, which was derived from the deferred dividend policies. A New Jersey statute enacted in 1907 required the company to ascertain annually the amount of surplus to which all outstanding participating policies are entitled, and to apportion it to them as a class. The apportioned surplus fund was required to be carried as a "distinct and separate liability to such class of policies" and used for no other purpose. By a resolution adopted in February, 1908, the company's board of directors apportioned the $15,616,716.52 as follows: $7,600,000 to be retained as a contingency surplus for protection of the company's obligations; $7,215,044.87, being 90 per cent of the remainder, apportioned to the deferred dividend policyholders; and all the rest, $801,671.65, apportioned to the stockholders to "be held and added to the contingency surplus of the *12 company and * * * not * * * paid out to the stockholders in the form of dividends, or otherwise, except by the future action of the Board." Similar resolutions were adopted for each year to and including 1942. The total amounts so apportioned to the contingency surplus, decreased by dividends paid therefrom, were as follows as of the end of the years indicated: Total Apportioned to
Year
Contingency Surplus
1909
$2,536,722.64
1913
4,812,339.24
1917
5,620,328.61
1926
5,642,646.33
1938
5,635,804.75
1943
5,626,595.58
On April 15, 1907, the New Jersey legislature enacted a statute requiring life insurance companies to elect whether to issue participating or non-participating policies, and forbidding the issuance of both by the same company. On July 8, 1907, the company's board of directors elected that only non-participating policies be thereafter issued. In the year 1907 the company's by-laws were revised to give the board of directors absolute discretion in declaration of dividends. Between the years 1907 and 1914, inclusive, the company paid regular dividends at the rate of 10 per cent of par out of current earnings to all stockholders. On March 29, 1915, under *13 authority of a New Jersey statute enacted in the same month, the company elected to change to the exclusive issuance of participating policies. "Prudential has for each year since 1915 to and including 1942 (excepting 1919 and 1920) paid out of current earnings to all of the stockholders dividends at the rate of 10%, such dividends being the full amount it was permited by law * * * to pay to its stockholders out of earnings of its business during said period, and in addition thereto, it has annually computed and paid to its stockholders by way of extra dividends" the annual earnings on the aggregate sums apportioned prior to April 5, 1915, to the stockholders from surplus as described above. The dividends paid for each year from 1915 to 1926 were as follows: $ From
From
Earnings on
Current
Apportioned
Per
Date of
Year
Earnings
Surplus
Total
Share
Payment
1915
$200,000
$240,000
$440,000
$11.00
Jan. 3, 1916
1916
200,000
250,000
450,000
11.25
Jan. 2, 1917
1917
200,000
250,000
450,000
11.25
Jan. 2, 1918
1918
200,000
250,000
450,000
11.25
Jan. 2, 1919
1919
100,000
250,000
350,000
8.75
Jan. 2, 1920
1920
150,000
250,000
400,000
10.00
Jan. 3, 1921
1921
200,000
260,000
460,000
11.50
Jan. 3, 1922
1922
200,000
260,000
460,000
11.50
Jan. 2, 1923
1923
200,000
260,000
460,000
11.50
Jan. 2, 1924
1924
200,000
260,000
460,000
11.50
Jan. 2, 1925
1925
200,000
260,000
460,000
11.50
Jan. 2, 1926
1926
200,000
260,000
460,000
11.50
Jan. 3, 1927
*14 According to the company's annual financial statements, its assets, capital stock, and surplus as of December 31 for the years 1913 and 1926 were as follows: Unassigned Profits
and Surplus Held
Year
Assets
Capital Stock
for Contingencies
1913
$ 323,167,248.90
$2,000,000
$23,644,458.62
1926
1,572,185,484.51
2,000,000
63,333,063.55
A New Jersey statute enacted in 1907 and in effect during the years 1907 to 1943 provided that in the event a stock insurance company is dissolved, no stockholder shall receive from the assets "more than double the par value of his shares, and the residue of the assets, if any, shall be paid into the state treasury for the use of the state." An exception was made where assets had accumulated to "such an extent that the net surplus belonging to the stockholders is now [1907] in excess of double the par value of the stock," in which cases the stockholders "shall receive their full and lawful portion of such assets heretofore accumulated." Decedent owned 725 shares of stock in the company for several years prior to April 17, 1913, when the board of directors resolved, under enabling legislation enacted during *15 the same year, to "change the said The Prudential Insurance Company of America from a stock life insurance corporation to a mutual life insurance corporation." The statute provided that stock companies electing to change to a mutual plan should purchase their own stock out of surplus without impairment of the rights of those stockholders who chose to retain their stock. The stock so purchased was to be transferred to a trustee for the policyholders, who would hold the legal title in trust to receive dividends and exercise voting rights. Mutualization was to be deemed complete only when all outstanding stock had been acquired. In connection with the company's petition to permit the change, the Chancery Court of New Jersey appointed three appraisers who, in a report to the Court dated June 26, 1914, appraised the value of the stock at $455 per share. In arriving at that value, the appraisers found the aggrepate value of the 40,000 shares to be $18,174,108.89. Of that amount $12,988,953.26 represented "assets belonging to stockholders," and included the capital stock of $2,000,000; the surplus of $4,812,339.24 previously apportioned to the stockholders; $1,518,038.41, being the stockholders' *16 share of "unapportioned surplus" from deferred dividend policies; a "special reserve" of $1,000,000 which had been "set apart in 1897 and 1899 from the surplus earned prior to that period"; and $3,658,575.61 included in surplus and "admittedly derived from non-participating policies." The remainder of the $18,174,108.89, in the amount of $5,185,155.63, was for "good will, earning power and going value." By order entered July 28, 1914, the Court fixed "the sum of Four Hundred Fifty-five Dollars ($455.00) as the price per share at which the said capital stock may be purchased by the said The Prudential Insurance Company of America for the benefit of the policyholders thereof." Thereafter, and prior to the date of decedent's death in 1926, the company purchased for cash out of its surplus 37,802.10 shares at $455 per share. By 1942, 39,463.24 shares had been so purchased. Sales made to the company, all at $455 per share, in 1924, 1925, 1927, and 1929 were as follows: Year
Shares Sold
Total Sales Price
1924
5
$ 2,275.00
1925
35/100
259.25
1927
13
5,915.00
1929
674
306,670.00
On January 23, 1915, decedent sold 323 of his 725 shares to the company for *17 $455 per share. He retained the remaining 402 shares until his death on December 4, 1926. In the Federal estate tax return of decedent's estate, the 402 shares were reported at a "fair market value at date of death" of $455 per share. Decedent's will contained the following provision: "* * * The Stocks I own in the Prudential Insurance Co. of America (402 shares) I order to be held by them [the executors], until they can realize the sum of not less than Five Hundred Thousand ($500,000) dollars, and I do not then require them to sell even at this amount, should they, in their judgment, deem best to retain them for a better price." Petitioner filed a New Jersey State transfer and inheritance tax return on June 21, 1927, in which it reported an estimated market value of $455 per share for the 402 shares. On March 30, 1933, in a letter to the attorney for decedent's estate, the company's president wrote: "* * * At the present time I can say to you very definitely that even if we had the authority to do so I would not be willing to recommend to our Board the payment of a price in excess of $455 per share. I doubt whether under present conditions if there was an open market *18 for this stock it would be selling at that figure. Judging by the market depreciation in stocks of other life insurance companies, such as the Travelers or the Aetna, our stock certainly would sell at a lesser figure than that. * * *" Capital stock of the company has never been listed on any stock exchange. At the date of decedent's death and for many years prior thereto, and in all years thereafter, there was no market or ready buyers for the stock except the company. It took the position at all times that it had no legal power or authority under the New Jersey statute to pay more than $455 per share. On December 11, 1937, petitioner brought an action in the New Jersey Court of Chancery against the company to compel it to distribute to the stockholders the amount apportioned from surplus throughout the years. The estate charged - "that the great majority of deferred dividend life policies issued by the said corporation and in force during the years 1907 to 1915, when the said fund for the benefit of stockholders as a class was created, * * * have been forfeited, lapsed and matured, and that * * * the remaining obligations of the said corporation under such of the aforementioned *19 policies as are still in force may be satisfied out of reserves of the said corporation * * * and out of surpluses specially apportioned to such policies * * * without resort to the aforementioned fund created for the benefit of stockholders * * *." The trustees for the policyholders petitioned to intervene, alleging that - "the surplus of said corporation, including the sum heretofore apportioned but not distributed to stockholders, is no more than sufficient to duly protect the policyholders * * *." The estate answered that the trustees had no interest in the controversy because "the said 39,415.24 shares of stock of the said corporation, to which the petitioners [trustees] claim title, were purchased from time to time by the said corporation and thereupon became the property of the said corporation and did not become the property of the policyholders * * * or of the petitioners as trustees * * *." The trustees were permitted to intervene. On September 23, 1942, pursuant to stipulation of the parties, the Court dismissed the action. In 1940 the New Jersey legislature enacted a statute permitting the company to acquire the remaining outstanding stock at "such price as *20 shall be mutually agreed upon by said corporation and the holder or holders." Negotiations, begun in January, 1941, under authority of the statute, culminated in an agreement approved by the Court on July 29, 1942, whereby the company purchased the remaining 536.76 shares for $1,500 per share. Included in the 536.76 shares were the 402 shares held by petitioner, who reported a long-term capital loss on the sale in a fiduciary income tax return for 1942, computed as follows: Sales price
$603,000.00
Less: Cost or other basis
$792,221.40
Sale expense
78,523.70
870,745.10
Loss
$267,745.10
50% of loss
133,872.55 In the return for 1943 a capital loss carryover from 1942 was taken in the amount of $1,000. In his notice of deficiency, respondent "determined that a gain of $341,566.30 was realized in the taxable year 1942 upon the sale of 402 shares of the capital stock of Prudential Insurance Company, the basis of which stock was $455.00 a share. Gross sale proceeds
$603,000.00
Less: Basis of stock was de-
termined
$182,910.00
Expense of sale
78,523.70
261,433.70
Profit on sale
$341,566.30"
The fair market value *21 of the 402 shares of Prudential Insurance Company stock owned by petitioner was, on the date of decedent's death, $455 a share. Opinion The issue is purely one of fact. Rogers v. Helvering (C.C.A., 2nd Cir.), 107 Fed. (2d) 394. It requires the determination of the fair market value of 402 shares of the stock of Prudential Insurance Company on the date of decedent's death in 1926, the measure of gain or loss realized on a subsequent sale by petitioner estate being the difference between that figure as adjusted and the selling price received in the instant tax year. Internal Revenue Code, sections 111(a), 113(a)(5). The value contended for by respondent is that employed by petitioner in filing the estate tax return. That value is recognized as not cinclusive. But it is both presumptively correct (Regulations 111, section 29.113(a)(5)-1(c): Bueltermann v. United States (C.C.A., 8th Cir.), 155 Fed. (2d) 597; Charles Bertram Currier, 7 T.C. 980), and held to "represent * * * values currently arrived at and * * * entitled to weight in determining the fair market value * * *." May Rogers, 31 B.T.A. 994, 1006, *22 affirmed Rogers v. Helvering, supra; Williams v. Commissioner (C.C.A., 8th Cir.), 44 Fed. (2d) 467. There were in addition numerous sales covering a long period of years and all at a uniform price. There is not, as there was in Walter v. Duffy (C.C.A., 3rd Cir.), 287 Fed. 41, evidence to suggest compulsion in these transactions and while the number of shares involved in individual sales may not have been great, the total of some 38,000 shares was a large proportion of the entire outstanding stock. The price at which the sales took place at least corroborates respondent's determination. Anna S. Richards, 13 B.T.A. 1279, 1284. Under ordinary circumstances it might be thought that a figure so overwhelming supported would fairly represent "the cash price at which a seller willing but not compelled to sell and a buyer willing but not compelled to buy both having reasonable knowledge of all the material circumstances will trade. Walter v. Duffy," supra. Andrew B. C. Bohrmann, 19 B.T.A. 507, 513. To sustain its burden, Estate of William McDougall, 45 B.T.A. 803, of showing that a figure more than four times *23 as large was the actual fair market value, petitioner relies upon the underlying factual background which is indeed unusual, as well as upon a series of contentions which are claimed to be supported by it. Briefly stated, the facts are that New Jersey legislation, establishing procedures for the mutualization of stock insurance companies desiring to issue participating policies, called for an appraisal of the value of the stock, for the purchase at that value by the company of the oustanding securities if tendered, and for severe limitations in the meantime on the payments of dividends and on liquidation. The appraisal was in fact undertaken; the figure arrived at was the $455 a share at which the bulk of the stock was eventually bought in; and it was not until some fourteen years after the decedent's death that the legislation was amended to permit the purchase by the company of petitioner's stock at the higher price at which in fact the ultimate deal was made which gives rise to the pending controversy. The contention is in essence that on these facts there was no free market for the stock, the actual sales should be disregarded, and an examination made of the "intrinsic" value of *24 the stock to determine what was in fact its actual value. We are not prepared to disregard actual transactions where there is no evidence of compulsion and the amounts traded in are so large and the price fixed so consistent as appears from this record. T. W. Henritze, 28 B.T.A. 1173, 1175. But even were we to do so and to make the "intrinsic" value examination, we should be forced to the same conclusion. What we are concerned with here is the value of the stock, not of the Prudential Insurance Company itself. See La Motte T. Cohu, 8 T.C. 796, 806, acq. 1947-2 C.B., 2. The "actual," as opposed to the "market" value of a security is a component of a number of elements, including its anticipated earning power and the ultimate repayment of the investment. Petitioner expresses its agreement with the statement that: "* * * Indeed, the value of corporate shares is probably in the end determined more by what income they will fetch than by any other single consideration." Rogers v. Helvering, supra, 395, 396. The rigid statutory limitations on the outstanding Prudential shares, restricting payment on dissolution to $100 a share and *25 of annual dividends to $5, even though augmented by the additional $6.50 paid on the "stockholders' fund" would have placed an intrinsic value on the stock of not much more than $200. The only element which justifies a finding as great as $455 a share arises from the continued willingness of the company to buy the stock in at that figure. Whether sales were made direct to the company or to third persons, that amount or something close to it could always be obtained because of the company's continued presence as a possible ultimate buyer. There may indeed have been transactions between individuals although the record shows none, but it is inconceivable that, under the circumstances, any stock would or did change hands at a substantially different figure. Petitioner advances an elaborate argument in an attempt to show that the statutory restrictions on the stock which the company observed were invalid or inapplicable, and that the surplus properly available to stockholders was so great that a 1926 value several times the $455 was inherent in the shares. It is difficult to assume that the State of New Jersey and the Prudential Insurance Company for almost thirty years continuously *26 violated the rights of petitioner and others in its position. At the best, a purchaser would be buying a difficult and costly lawsuit. [1] But if that situation did exist and added to the value of the shares it can reasonably be assumed that it would have been reflected in the price at which at least some part of them changed hands. The facts were publicly known. If any purchaser or any substantial group of sellers had believed that these facts appreciably increased the value of the stock, buyers and sellers would presumably have made deals at prices substantially higher than the sales shown by the record. No one did. In fact, the executor testified: "Q. Was that not the fair market value of the stock at date of death? "A. Yes, the fair market value. We could not get any more." Even if we use hindsight and appraise the stock as of 1926 in the light of what actually *27 happened sixteen years later, a vantage point no prospective buyer could have enjoyed at the time, the then prevailing price seems reasonable and the $1,970 a share for which petitioner contends entirely inconceivable. The amount actually received by petitioner in 1942 for the 402 shares was $603,000. According to respondent's tables, the present value [2] in 1926 of that amount to be paid sixteen years later would be only $321,946.52. Estate Tax Regulations 80, article 10. From this must be subtracted the certain expense, actually incurred but not shown by this record, of a protracted litigation. And when we add the entire uncertainty of the ultimate result, including the intervening necessity of amendatory legislation by the New Jersey Legislature, a total price in 1926 of about $185,000 seems to us as much as could reasonably have been secured at that time from a purchaser willing to take the most optimistic view of the future. *28 Petitioner relies heavily upon Walter v. Duffy, supra, where the value of the Prudential stock was also involved. To the extent that it found for the same stock a value identical with that proposed by respondent, it supports his view, rather than petitioner's, even though it be conceded that the factual nature of the valuing process makes one case very little help in deciding another. Estate of Caroline McCulloch Spencer, 5 T.C. 904; Charles L. Suhr, 4 B.T.A. 1198. In principle, however, Walter v. Duffy, supra, is entirely distinguishable. There the trial "court ruled out an offer to affirmatively prove, that during the years 1913, 1914, and 1915, while this valuation was being made, the company had not changed its financial status or made any gains or losses which affected the value of its stock." From this offer of proof if was concluded that the "stock was of that same intrinsic value, viz. $455, when the statutory valuation proceedings were begun in 1913, [which] was their value on March 1, 1913, when the income base was fixed, and remained $455 during 1914 and 1915, when the valuation investigation proceeded." We are *29 presently concerned with an interval of sixteen years from 1926 to 1942 rather than but three. There was no offer to prove and no evidence appears in the record [3] that the circumstances of the company, and particularly its relationship to this stockholder, did not materially improve in the meantime. In fact we know that in one respect the intervening enactment of amendatory legislation contributed fundamentally to the subsequent sale. *30 And furthermore the evidence in Walter v. Duffy, supra, showed that the sales relied upon were forced sales [4] and, of course, justify the holding which is indeed the sole proposition for which the case really stands, that "it was error not to admit proof of the circumstances under which the sales were made and evidence tending to establish the intrinsic value of the stock on March 1, 1913." That statement cannot be disputed. But it has no application here both because the facts and the record are entirely different and because, as we have stated, even a resort to the so-called intrinsic value produces the same result. Decision will be entered for the respondent. Footnotes
1. The attorney for the executor testified: "Q. So that if one bought the stock at more than $455.00 per share in 1926, it would have to be with the expectation of bringing a law suit against the Prudential Insurance Company for the purpose of obtaining more than the $455.00 per share? "A. Undoubtedly, yes."↩
2. $603,000 X.533908. It is true that computations of present value assume no intervening return whereas here some income was received on the stock. But at the ultimate sales price of about $1,500 a share, the dividends amounting to less than one per cent a year would be so small that we cannot conclude they would materially affect the calculation.↩
3. Respondent's counsel, in framing a question, made the statement: "Now, the stipulation will show that the company's business increased substantially between 1936 and 1942 * * *," but we have been unable to locate any such reference and have accordingly made no corresponding finding. If, however, we are permitted to take notice of Moody's Manual of Investments (Banks, Insurance, Real Estate, Investment Trusts), 1943, p. 1514, we find that, differing widely from Walter v. Duffy, between 1927 and 1942 the company's Admitted Assets increased from $1,789,267,000 to $4,927,047,000; the Insurance in Force from $11,660,520,000 to $20,182,270,000; the Net Life Reserves from $1,611,460,000 to $4,334,200,000; and the Capital and Surplus from $77,943,000 to $261,322,000, including Statutory Contingency Reserve from $11,848,000 to $178,627,00.↩
4. "It is quite manifest that when the banks forced the sale of the stock hypothecated by W. W. Blanchard the price obtained therefor could not be considered as conclusive proof of the 'fair market value' which the statute contemplated." Walter v. Duffy, supra, p. 48↩.